NORBECK VILLAGE JOINT VENTURE *v.*
MONTGOMERY COUNTY COUNCIL

[No. 270, September Term, 1968.]

*Decided June 3, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Norman M. Glasgow* with whom were *Whayne S. Quin* and *Wilkes & Artis* on the brief, for appellant.

*Paul A. McGuckian* and *Philip J. Tierney, Assistant County Attorneys,* with whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appeal is from the action of Judge Pugh in affirming the reclassification of the appellants' land under a sectional map amendment of the Olney area (a comprehensive rezoning of almost 50 square miles), adopted by the Montgomery County Council, sitting as a district council, on the proposal of the Maryland-National Capital Park and Planning Commission (MNCPPC).

In 1966 all the members of the Montgomery County Council save one were denied reelection by the voters of the County. By its actions taken on November 9, 10 and 11 the lame-duck Council granted a great number of rezonings. The new Council moved to reconsider some 75 of these and appointed an ad hoc committee of County legal officers, other lawyers and zoning experts to recommend further procedures and proceedings. The ad hoc committee reported in part:

"In the rezoning decisions of November 9, 10 and 11, 1966, before the old District Council was halted by Court order, it rezoned approximately 2,000 acres of land. Virtually all of these rezonings were contrary to a master plan, either proposed, adopted, or approved. Some, such as those

in the Olney area, were contrary to a Master Plan which the District Council itself had approved only a few months before. Most of the decisions were also contrary to the recommendations of the staff of the Planning Commission and the Montgomery County Planning Board, whereas, in the years prior to the time the Council took office in 1962, the District Council, year in and year out, followed the recommendation of the Montgomery County Planning Board in approximately 80% of the cases.

"These actions, and the manner in which they were made, have attracted widespread notoriety to the point that the trust and confidence of the public in the zoning and planning policies of the County have been seriously undermined.

\* \* \*

"By letter dated November 22, 1966, the Department of Housing and Urban Development suspended federal grants for open space land and sewer and water facilities because of the rezoning decisions in question, characterizing them as major revisions of land use and contrary to the comprehensive plans of the County. A true copy of said letter is attached hereto and made a part hereof.

"In addition to the foregoing general considerations, the Committee in its review of the individual cases has found substantial reasons to reconsider some zoning applications as follows: the attorney for several applicants has suggested that it is in the public interest to have rehearings; in some instances, there were failures to incorporate in the record of the proceedings adopted or approved plans and rezonings in the immediate area; some opinions accompanying the rezoning reflect errors in fact, material contradictions or inconsistencies, or findings based upon insubstantial evidence."

Included in the specified midnight rezonings moved to be reconsidered by the new Council was application E-928, a proposal by MNCPPC for sectional map amendment of the Olney region, filed on July 28, 1966, to implement a General Plan for the Maryland-Washington Regional District which the MNCPPC had adopted in early 1964, and a Master Plan approved by the District. Council on August 31, 1966, both envisioning Olney as a satellite low density community ultimately to have 19,000 people at the core and 10,000 on the fringe. The Plans contemplated a green belt of open spaces and parks to shield the Olney area from the ever-lengthening and overcrowding suburban sprawl coming out of Washington, and changed the zoning designation of appellants' land, some 183 acres in the southeast quadrant along the east side of Georgia Avenue, from R-R (half acre lots) to R-A (two acre lots), as it did some 12,000 other acres. A public hearing was held on October 17, 1966 on E-928. Officials of MNCPPC and of the County Citizens Planning Association offered extensive testimony in support of the application and it also was supported by the technical staff of the Planning Commission and the Commission. The appellants presented several experts to refute the concepts of the Master Plan urging in essence that the prior policy of allowing all the small houses that the ever-increasing population of the County would buy or rent be allowed in the Olney area, which would lead to a population of some 200,000 despite the conceded inadequacy of sewerage and roads. The old Council rejected the Master Plan it had approved a few months earlier by denying application E-928.

The new Council, on December 6, 1966, extended until March 7, 1967, some three weeks after it had resolved to reconsider the various cases, the time for final action on its reconsideration of E-928. On December 29, 1966, the Planning Commission filed a comprehensive rezoning plan, application E-998, encompassing 49.5 square miles —some 30,000 acres, including those of appellants—to implement the Olney and vicinity Master Plan. By Reso-

lution No. 6-221 of February 21, 1967, the Council allowed the withdrawal of E-928 without prejudice, having taken no action whatever on the merits of E-928. The appellants who had prevailed on E-928 before the old Council did not appeal from the action of the new Council in permitting its withdrawal.

The Planning Commission adopted the recommendation of its technical staff to the District Council that E-998 be approved. A public hearing was held on E-998 on April 21, 1967. MNCPPC's director, Hewins, testified in favor of the application as an implementation of the joint purposes of the Master Plan: the preservation of open spaces and the protection of the watershed area. He described the background of the Olney community plan as a result of the General Plan—Year 2000 Plan—which provided for the development of wedges and corridors throughout the county. Satellite corridors included plans for corridor cities such as Gaithersburg and Germantown with planned population in excess of 100,-000. Olney as a self-identifiable community with its own hospital, schools, commercial area, and theater was qualified and selected as a satellite community. The Olney area was selected above other possible locations in the County for this development because of its geographical setting and natural amenities which encouraged the planned growth concept. No other area was found to possess the assets of the Olney community. Hewins further testified that this plan was in accordance with sound planning principles. According to Hewins, the plan promoted a land use pattern within which an integrated cultural-social-community service complex can develop around a 75-acre shopping district. Also, he said, that the Plan's highway network provides convenient access to residents of the community and fits into the broader transportation needs of the region.

A purpose of the Plan was described as promoting the physical isolation of Olney from suburban sprawl. Low density residential zoning was recommended to break the development pattern from the suburbs. The proposed zon-

ing in the plan is in accordance with existing develop-
ment. It was stated that a serious deficiency of public
services would exist if the Master Plan was not adopted.
The plan was to accomplish a staged development using
the tools of zoning and sewer access to avoid the excess
costs of public services. A critical element of the Plan was
to encourage earlier growth along the 70S corridor rather
than on the Patuxent River Watershed thereby protect-
ing the basin from pollution. Hewins did point out that
cluster development of the R-A zone could be served by
sewers, but the District Council reserved the power to
approve these applications separately as a tool to guide
growth within the desired limits.

Appellants presented several experts to challenge the
credibility of the Master Plan. The appellants pointed to
the need for R-R development of middle income housing
and the natural development of the "Georgia Avenue cor-
ridor."

Appellants make three arguments: 1 — the newly
elected Council illegally nullified the decision of the pre-
vious Council on E-928, thereby denying appellants due
process of law; 2—the granting of E-998 resulted in an
unconstitutional taking of appellants' property by sub-
stituting zoning for eminent domain and depriving ap-
pellants of all reasonable use of their property; 3—the
decision in E-998 was not in accordance with the public
health, safety, security, morals and general welfare and
therefore was arbitrary, unreasonable, discriminatory
and otherwise illegal.

Appellants start their argument on the procedural
aspects by in effect claiming a vested right in the old
Council's decision in E-928, arguing that a prior deci-
sion by the Council can be reopened only for fraud, sur-
prise or mistake and that there is no statutory authority
for the allowance of a withdrawal without notice or hear-
ing.

*Hunt v. Montgomery County,* 248 Md. 403, largely an-
swer appellants' argument and compels its rejection.
There we approved a declaration by Judge Clapp (which

appears in the record of that case but not in the reported decision) that § 111-50 of the Montgomery County Code (1965) did not require good cause be shown for the Council to reconsider a prior zoning decision. In that case the very resolution under which E-928 was reconsidered, Resolution 6-4, was at issue.

Section 111-48 of the Code expressly permits the Council to allow an applicant to withdraw his application. In no way does the section impose on the Council's action in permitting a withdrawal the requirements imposed on the grant, denial or dismissal of an application. The only proviso is that if withdrawal is requested after publication of the notice of hearing, no application for rezoning of the same land shall be allowed within eighteen months unless the Council by resolution waives the time limitation.

Appellants took no appeal from the Council's action in allowing withdrawal of application E-928 and cannot enjoy a belated appeal under the guise of the collateral attack they now seek to make. *Cf. Skipjack Cove Marina v. Co. Comm'rs,* 252 Md. 440, 452.

The appellants argue that for the County to decrease the permissible density of their land and that of other similarly zoned land and to refuse to furnish sewerage to their land in order to control the growth of population and to continue the present open space in the Olney region was to use zoning and planning impermissibly as a substitute for eminent domain and to reduce so substantially the value of their land as to amount to confiscation.

If these contentions are sound, no zoning would ever have been allowed or sustained and all comprehensive rezoning would have to continue or increase permissible density, not reduce it. All original zoning decreases the right to use property as the owner pleases. Zoning places restrictions on property that was free of any restriction and the value of some if not most of that property necessarily is going to be lessened. None of this as such invalidates comprehensive zoning, original or subsequent.

*Euclid v. Ambler Realty Company,* 272 U. S. 365, 71 L. Ed. 303; *Ark Readi-Mix v. Smith,* 251 Md. 1. The broad test of the validity of a comprehensive rezoning is whether it bears a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare, and such zoning enjoys a strong presumption of validity and correctness. *Scull v. Coleman,* 251 Md. 6; *Stevens v. City of Salisbury,* 240 Md. 556. A property owner has no vested right to the continuance of the zoning status of his or neighboring property, merely the right to rely on the rule that a change will not be made unless it is required for the public good. *Wakefield v. Kraft,* 202 Md. 136, 144. In *Queen Anne's County v. Miles,* 246 Md. 355, 368, a minimum area zoning that limited residential use to five acres was upheld. Judge Oppenheimer for the Court said:

> "[I]f the [comprehensive zoning] has a substantial relationship to the general welfare of the community in that it can fairly be taken as a reasonable effort to plan for the future within the framework of the County's economic and social life, it is not unconstitutional because under it some persons may suffer loss and others be benefited."

In *Krieger v. Planning Commission,* 224 Md. 320, 323, the appellant challenged the Planning Commission's refusal to approve his development plan as illegal and a deprivation of his property without payment of just compensation by requiring large lots and denying road access. Judge Henderson for the Court said:

> "The basic constitutional point was decided long ago contrary to the appellant's contention. Zoning regulations according to a comprehensive plan and in the general public welfare may place restrictions on the use of property even though the restrictions result in serious financial loss to the owner. * * * Of course, the re-

strictions must be supportable as a proper exercise of police power. For recent cases on the subject, see *Walker v. Board of County Com'rs of Talbot County,* 208 Md. 72, 90, cert. denied, 350 U. S. 902 and *Grant v. Mayor & C. C. of Baltimore,* 212 Md. 301, 314."

On these grounds piecemeal zoning changes from commercial to residential use have been upheld. *Scull v. Coleman,* 251 Md. 6; *Serio v. City of Baltimore,* 208 Md. 545. For an individual property owner to escape the binding impact of a comprehensive rezoning he must show that the plan lacks the necessary relationship to the general public interest and welfare that is presumed or that the effect of the plan is to deprive him of any reasonable use of his property.

The record clearly supports, if indeed it does not require, the finding Judge Pugh made that the challenged rezoning was not arbitrary, discriminatory or illegal. The Olney plan, in conformity with the General Plan, was a carefully thought out, carefully implemented policy of preserving a portion of Montgomery County, presently suitable (by reason of its geographical setting and natural amenities which encouraged the planned growth concept) for preservation as a self-identifiable community with its own hospital, schools, commercial area and theater, as a relatively low residential area which would break and hold back the spreading urban intrusion into the country. The plan sought to encourage earlier growth along the interstate 70S corridor rather than on the Patuxent River Watershed, thereby protecting the basin from pollution. Appellants dispute the validity of the concept underlying the plan and of the legality of the plan but do not suggest that it was not conceived and adopted in the utmost good faith, and they did not overcome the strong presumption that the plan was valid legislative action, a presumption buttressed in this case by reason of the fact that the plan implemented the General Plan and the Master Plan. See *Scull v. Coleman, supra,* at p. 11 of 251 Md.

The Olney area roads, sewers, schools and fire and police protection will not according to the record presently support urban or intense development, and to install the additional facilities that would be necessary to support a changed pattern would place a burden on the taxpayers that the County legislative body thinks is unwarranted and beyond its present reasonable capabilities.

The appellants did not, by an Olney plan country mile, meet their heavy burden of showing that the rezoning they dispute confiscates their property. The governing rule is that he who claims confiscatory action must show that the protested zoning precludes use of his property for any purpose for which it is reasonably adapted. It is not enough for the owner to show that the exercise of the police power, an essential attribute of sovereignty, by a rezoning or a failure to rezone results in substantial loss or hardship. *Baltimore City v. Borinsky*, 239 Md. 611; *Tauber v. Montgomery County*, 244 Md. 332. In *Franklin Constr. Co. v. Welch*, 251 Md. 715, 722, it is said:

> "The burden on an applicant to establish an unconstitutional taking under the zoning law is a heavy one and not only must the applicant for rezoning show that a particular use of the property cannot be made under the existing zoning but that the subject property cannot reasonably be used *for any of the uses permitted in the existing zoning.*"

See also *Eger v. Stone*, 253 Md. 533.

Under § 111-5 a number of uses are permitted as of right in an R-A zone and under the succeeding paragraph b any of a further list of special exception uses may be availed of, many of which would be practicable under the Olney regional plan. There was no effort to show that appellants' land could not be utilized for any of the permitted uses.

Furthermore, the testimony was that the appellants could not do more with the land as R-R (as it was when

they bought it prior to 1965) than they could under its rezoned status of R-A. They had attempted to have the County extend sewerage to the property when it was rezoned R-R and had been turned down. They did show that land in that area zoned R-A was worth $2,000 to $3,500 an acre and that land zoned R-R was worth $3,500 to $8,000 an acre. The present paper worth of their holdings, say appellants, was cut by two-thirds by the rezoning, a substantial loss, but it can hardly be argued reasonably that land that is worth $2,000 to $3,500 an acre has been confiscated. Indeed, after the rezoning they voluntarily sold 65 of their 183 acres to the County for park use at an apparently satisfactory price. In *Marino v. City of Baltimore,* 215 Md. 206, the property was worth $14,-000 under its existing residential zoning and was worth $140,000 if rezoned commercial as the owner asked unsuccessfully that it be. We held that this loss to the owner was not controlling.

What we have already said disposes, in our view, of appellants' third contention, a general and abstract statement that the decision in E-998 was not in accordance with the public health, safety, security, morals and general welfare and was therefore arbitrary, unreasonable, discriminatory or otherwise illegal.

*Order affirmed, with costs.*