# MONTGOMERY COUNTY COUNCIL v. LEIZMAN ET AL.

[No. 266, September Term, 1972.]

*Decided April 25, 1973.*

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*H. Christopher Malone, Assistant County Attorney,* with whom were *Richard S. McKernon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellant.

*Robert H. Metz,* with whom were *R. Robert Linowes* and *Linowes & Blocher* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

We are confronted here with variations on a familiar theme. *Malasky v. Montgomery County Council,* 258 Md. 612, 267 A. 2d 182 (1970); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 254 A. 2d 700 (1969); *Scull v. Coleman,* 251 Md. 6, 246 A. 2d 223 (1968); *Hunt v. Montgomery County,* 248 Md. 403, 237 A. 2d 35 (1968). It turns out, however, that there is really only one question to be resolved, *i.e.,* whether the zoning application (No. F-657) filed by The Maryland-National Capital Park and Planning Commission (Commission) proposes a comprehensive rezoning bearing a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare. If there is such a relationship then the comprehensive rezoning, which was granted by the Montgomery County Council sitting as the District Council for the Maryland-Washington Regional District in Montgomery County (Council) enjoys a strong presumption of validity and correctness, *Norbeck, supra,* and the cases therein cited. The trial judge, Shure, J. (now C. J.), reversed, in respect of the appellees' property, the action of the Council; this is the Council's appeal. We shall hold to a minimum our recital of the factual background.

The appellees own two parcels of land [1] in the southern quadrant of the intersection of Muncaster Mill Road and Redland Road in the Rock Creek Planning Area of Montgomery County. Parcel 26 contains 3.1 acres; Parcel 28, 0.2 acres. Both parcels were in the R-R (Rural Residential) classification when the appellees became the contract purchasers. The contract for Parcel 26 was dated 26 October 1965 subject, of course, to its reclassification to C-1 (Local Commercial) or C-2 (Gen-

---

1. They own also two adjoining parcels in the C-1 classification which are not involved here.

eral Commercial). For convenience we shall call both parcels the property except when it is necessary to refer to one or the other separately.

On 29 November 1965 the appellees applied for the reclassification of Parcel 26 from R-R to C-1 or C-2. The technical staff of the Commission's Planning Board (Board) thought the application "should await [the] adoption of the soon-to-be-published revised Master Plan." It recommended denial of the application unless the appellees chose to withdraw their application. The Board (on 7 June 1966) agreed with the staff, recommending disapproval "in the event the District Council" elected to take action thereon rather than defer action pending the adoption of the revised Master Plan. The application for the reclassification of Parcel 28 was filed in May 1966 but, so we were told by counsel, action thereon is still pending.

The Rock Creek Planning Area, about 18 square miles, is north of Rockville, south of Laytonsville, west of the Olney Planning Area and east of the Gaithersburg Planning Area. The General Plan for Montgomery and Prince George's counties adopted by the Commission in January 1964 suggested that the area now known as the Rock Creek Planning Area be devoted to the maintenance of open spaces and to "low density" residential uses. Intense study of the area continued and by September 1966 the Preliminary Rock Creek Master Plan had been completed. The uses indicated for the land in the southern quadrant of Muncaster Mill Road and Redland Road (including Parcel 26 and Parcel 28) were a library, a post office, and uses permitted in R-R areas.

On 27 October 1966 the Commission held a public hearing on the proposed plan, beginning at 8:00 p.m. and ending at 1:30 a.m. Discussion was both lively and partisan. Then came Election Day, 8 November.

When the votes had been counted it became dismally apparent that six of the seven members of the Council had been given the old heave-ho. Within 48 hours the "lame ducks," it is said, held an unscheduled "midnight"

meeting to act on all pending zoning applications. Among those granted was the appellees' application to reclassify Parcel 26 from R-R to C-1.

A month or so later, on 14 December, the Commission adopted, unanimously, the Master Plan for the Rock Creek Planning Area. One of the Commission's 34 amendments thereto recommended the reclassification of Parcel 26 from R-R to R-T (Residential—Town Houses).

The (new) Council held a public hearing on 22 February 1967. Some 20 persons made statements during the four hour proceeding. The appellees did not attend, either in person or by attorney. In April the Council asked the Board for additional information and in the fall of 1967 it participated in "work sessions" with the Board and the staff. In November 1967 the Council returned the plan to the Commission with a recommendation for amendments; the Commission and the Board adopted the Council's recommendation. On 13 December the Council held a public hearing on the Commission's application (No. E-1009) for a sectional map amendment designed to implement the recommendations of the proposed Master Plan.

Another hearing on Application E-1009 was held on 14 February 1968. Counsel for the appellees emphasized the reclassification of Parcel 26 to C-1 on 10 November 1966 by the "midnight" Council. He complained that the granting of Application E-1009 would reclassify Parcel 26 from C-1 to R-T. Several days thereafter the Council asked the Board to provide more information in this regard. The Board responded at length. It said that its review of the Master Plan after the public hearing had led it to the conclusion that Parcel 26 should not be allowed to remain in the C-1 classification, mainly because a proposed community center about one-half mile to the west would be "more centrally located in the area of high density" and because it would have better access to major highways. The Board said also that "the 12.04 acres of land [Parcel 26 not included] proposed for convenience type commercial purposes at the Redland

intersection was sufficient" and that leaving Parcel 26 in the C-1 classification "would prejudice the single-family residential area directly north across Muncaster Mill Road."

It seems reasonable to assume that during the succeeding months the Master Plan was the subject of continued discussion and study. On 28 December 1970 the Commission applied (Application F-657) for a sectional map amendment in respect of all of the 17.9 square miles within the boundaries of the Rock Creek Planning Area. The reclassification of nearly 9,000 acres not in conformance with the Plan was requested. The classification requested for Parcels 26 and 28 was R-T; the same classification had been requested in E-1009. On 4 February 1971 the Board unanimously recommended to the Council the approval of F-657.

Counsel makes much of a letter, dated 11 February 1971, from the chairman of the Board to the president of the Council. At the public hearing on No. F-657 held by the Council on the same day, 11 February, the letter which is set forth below was read into the record:

"The Montgomery County Planning Board, at its regular meeting today, upon request of Mr. Robert Metz, reconsidered its action on February 4, 1971 in approving the Sectional Map Amendment F-657, as submitted. Mr. Metz pointed out to the Planning Board that Parcels 26 and 28, as identified in the sectional map amendment submission, should be deleted from reclassification to the R-T Zone. As the result of action by the prior Council on November 1, 1966, Parcel 26 was reclassified to the C-1 Zone. Subsequently the applicants filed for a record plat and obtained a building permit for the construction of a food store on Lot 12.

"Although the adopted plan recommends these parcels for the R-T classification, the fact that the property owner, based upon the rezon-

ing process, proceeded in accordance with the regulations of the C-1 Zone and has committed himself to the development of that land, the Board recommends that Parcel 26, containing three (3) acres, and Parcel 28, containing 0.2 acre, both of which were recommended to be reclassified to the R-T Zone, be deleted from the application and be allowed to remain in their existing zoning classification. This alteration to our prior recommendation, upon the recommendation of the technical staff, was passed by a unanimous vote with all four members being present.

"With the exception of this change, our prior recommendation of adoption of the sectional map amendment remains in effect."

At the conclusion of the hearing the president of the Council announced that the record would remain open until 18 February. On 14 February there was placed in the record a letter from James G. Early on behalf of several neighboring communities. His letter is as follows:

"I had not planned to add to my testimony and submitted statement of February 11, 1971, but after listening to the discussion by several speakers concerning parcel 26, I felt I should include in the record this supplemental statement. There are several points which I was unable to develop on the 11th which I think are relevant to parcel 26 which we feel very strongly should be placed in the R-T zone . . . .

* * *

"2) Our communities were advised in 1969, when E-1009 was again brought before the Council, that the developers had a signed contract with Safeway for the food store. At that time, a foundation permit, not the

usual building permit, was issued which would allow the foundation of one store to be started. To this date, construction has not been initiated. Further, this foundation permit was issued to the developer with the understanding that a full building permit might not be issued and any construction begun under the foundation permit would be nullified and would not constitute having an 'economic or vested interest' on the land.

"3) Currently there is an occupied home on parcel 26 so it would seem that construction is not close at hand.

"4) Finally, we tried to make the point that one local shopping center with a variety of stores is on the verge of construction by the developer of Mill Creek Towne on land adjacent to Mill Creek Towne (see Figure 1 in our written statement, the 4 acre site west of Redland Road-Muncaster Mill Road, next to the WSSC pumping station). This shopping center plus the other existing 6.7 acres of commercial are more than sufficient for local shopping. Thus a second center using parcel 26, duplicating the same kind of commercial establishments, would seem hardly justified and certainly the commercial development at this intersection would no longer be local in character.

"I appreciate the opportunity to add this statement to the record."

There are also letters from one of the appellees and from counsel. We have set forth excerpts from each of them:

"In 1965, we signed a contract to purchase the tract in question called the Wilhelm tract,

subject to commercial zoning. The County Council, at that time, zoned the parcel C-1. We were aware, however, that a New County Council was soon to take office, and decided to postpone settlement to see what the new Council might do as regards this property. The new Council, in a published report, decided to review many properties zoned by the former Council, but made no mention of the review of our parcel. It was at this point that we felt it was safe to purchase the property (which we did at commercial prices). In addition to this tract, three other tracts were purchased with the idea of constructing a shopping center. Through a series of misadventures regarding this property, too long to relate here, and, through a lack of sophistication and knowledge of the commercial world, as well as a tight money market, we have found ourselves in serious financial difficulties and unable, by any stretch of the imagination, to even consider the construction of a shopping center by ourselves.

"A building permit has been issued, and, through a long series of negotiations with Safeway and Dart Drug, Safeway has recently signed a contract. A verbal agreement from Mr. Haft of Dart Drug has been obtained. A signed contract will be forthcoming upon his return from abroad. Even with the consummation of this sale, my partner and I will lose about $75,000 (not including interest on loans due the bank). Please be aware that, other than this property, I am not engaged in any other real estate transactions. Dentistry is the sole source of my income.

\* \* \*

"It is now costing us approximately $25,000 per year to carry the property, plus remaining

mortgages, interest and taxes totalling almost $190,000. We cannot meet this obligation, and, unless we can borrow the money, face potential bankruptcy." (From letter of appellee Jacobs.)

"The doctors proceeded to apply for and receive a building permit on November 28, 1968, for the construction of a grocery store. This building permit has been extended several times, the last time for a 6-month period beginning in November, 1970. The four tracts of land were the subject of a subdivision plat which was approved on a preliminary basis by the Maryland-National Capital Park and Planning Commission in 1968 and received final approval on October 15, 1970. The subdivision plat is now being processed through the Department of Public Works so that it can be recorded as Parcel C, Redland. The doctors have negotiated a contract with Safeway Stores and Dart Drug. The Safeway contract is signed, and the Dart Drug contract has been agreed upon but not signed as yet.

"The two doctors are neither developers nor builders and classify themselves as unsophisticated land investors. They have purchased the four tracts of land, paying commercial prices, and have proceeded to have it developed as best and as fast as possible." (From letter of counsel.)

The Council, on 2 June 1971, granted Application No. F-657. In its opinion it observed that

"[t]he purpose of the sectional map amendment is to bring the zoning of the Upper Rock Creek Valley into conformity with the Rock Creek Master Plan which was adopted by the Commission on December 14, 1966 and amended November 29, 1967 in accordance with the recommendations of the District Council, by reclassifying approximately 8,923.8 acres."

630

The Council went on to say:

"This comprehensive rezoning is to provide for a coordinated, planned and orderly development of the Rock Creek Area in accordance with the Master Plan through low density development, which will preserve the concept of an open space wedge consistent with the intent of the General Plan adopted in January, 1964, and preserve Rock Creek and the Rock Creek Valley. The Master Plan proposes to accomplish these objectives through neighborhood and community design based on a strong, open-space framework centrally located adjacent to main streams using the 'cluster' method where possible. The pattern of development progresses in intensity with the lowest adjacent to open space areas, and the highest allowable along the ridges, except centrally in the southern section of the plateau where the area between the two flood control lakes is recommended for the lowest density development. Park and public open space, and private conservation areas are a major part of the basic design structure. Commercial and industrial areas will be retained, except for some modification.

". . . The Council disagrees with the Planning Board with respect to parcels 26 and 28, located in the southern quadrant of the intersection of Redland Road and Muncaster Mill Road, finding that they should be reclassified from the C-1 Zone and R-R Zone respectively to the R-T Zone to provide a transition and a buffer between commercial properties and the adjacent lower density residential areas.

"For these reasons and because to grant this application will aid in the accomplishment of a co-ordinated, comprehensive, adjusted and systematic development of the Maryland-Washington Regional District, and will be in the gen-

eral public interest and general welfare, this application, as amended will be GRANTED."

The appeal to the circuit court came on for a hearing before Judge Shure on 25 January 1972. In his opinion, filed 17 July 1972, after reciting, verbatim, the letter of 11 February 1971 from the chairman of the Board to the president of the Council, *supra,* he said:

". . . It is therefore clear that application concerning Parcel 26, containing three acres, and Parcel 28, containing 0.2 acres, both of which were reclassified to the R-T zone, had been withdrawn by the Applicant."

The appellees advanced the same notion here but we do not find it persuasive. The applicant was the Commission, not the Board, and it does not appear that the Commission ever considered the matter. Moreover the Board, fully aware of the adoption of the Plan by the Commission, did nothing more than *recommend* to the Council that parcels 26 and 28 be "deleted from the application." The Council, of course, did not accept the Board's recommendation, leaving the application of the *Commission* unchanged.

In the court below the appellees made a strong argument that they had acquired "vested rights" in respect of their C-1 classification. Judge Shure agreed. We shall not undertake a review of this aspect of the case because the appellees have not discussed it in their brief and at argument counsel stated unequivocally that it had been abandoned. *Richmond Corporation v. Board of County Commissioners for Prince George's County,* 254 Md. 244, 252, 255 A. 2d 398 (1969).

We think it very curious indeed to find the appellees seriously advancing the argument that the Commission's application "bears no relationship to the public health, safety, morals or general welfare," especially since *Norbeck, supra.* That the Master Plan for the area is the end result of a decade of constant study and discus-

sion is not open to question. Its concept is clear of purpose. In the words of the Commission:

". . . It recommends that man's use and occupancy of this essentially rural area be guided by the desire to build and preserve in concert with the natural environment.

"For a quarter century urban and suburban growth has moved outward in Montgomery County like a lava tide, engulfing the countryside before it, so that today, except for the few ribbons of stream valley parks, there is an almost unrelieved pattern of urban development. There is no way of foreseeing when this metropolitan growth will stabilize. Thus, the significance of the 18-square-mile area as a part of the regional design cannot be ignored.

"Today's threat to the valley, if allowed to become a reality, will again advance the frontier of the urban fringe, and tomorrow's citizens will be confronted again, but in a more remote area of the County, with decisions similar to those posed in the Rock Creek Planning Area.

"Let there be no minimization of the current threat to the valley, for it is real. If the open-space concept is destroyed here, a precedent will have been established for uncontrolled invasion of other areas designated on the General Plan as wedges of open space, and the Montgomery County urban community will grow without form or direction.

"If form and vitality are to be achieved in the Rock Creek Planning Area and if this is to be a prototype for other portions of the County where the pattern of low-density development and open space is to be preserved, then the principles set forth in this report to guide growth and development and the methods suggested for implementation, all of which resulted

from incisive investigation and evaluation of the alternatives, must be observed."

In *Norbeck, supra,* the Plan for the Olney Area was under attack. We think what Chief Judge Hammond, writing for the Court, said there applies quite as well here:

> ". . . The Olney Plan, in conformity with the General Plan, was a carefully thought out, carefully implemented policy of preserving a portion of Montgomery County . . . as a relatively low residential area which would break and hold back the spreading urban intrusion into the country. . . . Appellants . . . did not overcome the strong presumption that the plan was valid legislative action, a presumption buttressed in this case by reason of the fact that the plan implemented the General Plan and the Master Plan. . . .

> \* \* \*

> "The appellants did not, by an Olney plan country mile, meet their heavy burden of showing that the rezoning they dispute confiscates their property. . . . It is not enough for the owner to show that . . . a rezoning or a failure to rezone results in substantial loss or hardship." 254 Md. at 67-68.

Although he "strained to find where this change back to residential would be for the public good" Judge Shure could find "no showing that [the] public good would be furthered." We think the learned judge neither strained very hard nor looked very far. The Master Plan was there for all to see and the "midnight" reclassification surely had trouble written all over it. Even so the appellees might have emerged unscathed had they called to mind the advice of Horace, *i.e.,* "Seize the day, put no trust in the morrow." [2] They could have built a covey

---

2. *"Carpe diem, quam minimum credula postero."* Quintus Horatius Flaccus, *Odes,* bk I, ode xi, last line.

634

of shopping centers between November 1966, when they were given the C-1 Zoning, and June 1971 when it was taken away.

> *Order reversed.*
> *Resolution of the District Council adopted 2 June 1971 granting Application No. F-657 reinstated.*
> *Costs to be paid by the appellees.*