359 A.2d 321.

JUNE 24, 1976.

GOLDEN GATE CORPORATION *vs.*
TOWN OF NARRAGANSETT *et al.*
CHARLES BUTTERFIELD, JR. *et al. vs.*
TOWN OF NARRAGANSETT *et al.*

PRESENT: Paolino, Acting C. J., Joslin and Kelleher, JJ.

KELLEHER, J. We have consolidated these two statutory petitions for certiorari. The petitioners in each case are the owners of substantial parcels of real estate located in the town of Narragansett. They are challenging the town council's March 6, 1974 adoption of an ordinance which constituted a major revamping and overhaul of Narragansett's zoning ordinance. Their challenge is based upon the following three grounds: (1) lack of sufficient notice regarding a public hearing held prior to the adoption of the new ordinance; (2) the council's failure to conduct a fair and impartial hearing; and (3) the amendment's purported confiscation of the petitioners' property.

At the outset we note that petitioners are before us pursuant to the provisions of P. L. 1928, ch. 1277. This is a special Act that authorizes the Narragansett Town Coun-

cil to enact zoning ordinances and permits review of the council's actions in this court by way of certiorari.[1] Hereinafter we shall, when appropriate, refer to petitioners as Golden Gate and Butterfield and respondent as Narragansett.

## The Notice

In this facet of their challenge, petitioners place great emphasis on our holding in *Federal Bldg. & Dev. Corp.* v. *Town of Jamestown*, 112 R. I. 478, 312 A.2d 586 (1973), where we ruled that a notice published in connection with the townwide rezoning did not sufficiently apprise the average property owner of the scope of the contemplated changes. We are aware that since the publication of the

---

[1]The 1928 legislation is substantially identical to special enabling legislation which was enacted for each of Narragansett's neighboring towns, North Kingstown and South Kingstown. All three Acts specify that any person aggrieved by zoning legislation can petition this court for relief by way of certiorari, and each Act also provides that this court may hear evidence or appoint a master to hear such evidence. However, in *Lang* v. *Town Council*, 82 R.I. 361, 363, 108 A.2d 166, 166 (1954), and in *Beauregard* v. *Town Council*, 82 R. I. 244, 245-46, 107 A.2d 283, 284 (1954), we stressed that there was nothing in the enabling legislation which would give an aggrieved party a review of "any action" taken by a town council as it enacted, amended, or repealed a zoning ordinance but that the review in this court would be limited strictly to questions relating to sections of the enabling legislation which call for a notice, a public hearing, the preservation of nonconforming uses, and the continuance of the right to engage in agricultural or farming pursuits. It was held in both the *Lang* and *Beauregard* cases that the enabling legislation could not be construed as an abandonment of the general principle that certiorari will not be used to review proceedings that are purely legislative or administrative in character. What was said about North Kingstown and South Kingstown applies equally as well to the present controversy. Our review of the action taken by Narragansett in revising its zoning ordinance will be limited to the notice and the type of public hearing contemplated by P. L. 1928, ch. 1277, §3. The General Assembly at its January 1967 session amended the 1928 legislation so that the town council could establish a zoning and platting board of review. The 1967 Act retained the provisions relating to review by certiorari in this court and the ability to hear evidence or appoint masters.

556

*Jamestown* opinion certain responsible municipal officials have expressed concern about what constitutes adequate notice when a city or town is engaged in a broad revision of its zoning legislation. Apparently, some have taken the view that the only safe approach is to publish the proposed ordinance in its entirety, and this was the course of action taken by the Narragansett officials. The entire ordinance and zoning map[2] were published several times in a local newspaper. The notice which preceded the February 27, 1974 public hearing was published in the January 31, February 7, 14, and 21 editions of The Narragansett Times, a newspaper which is regularly published in Washington County.

In the *Jamestown* case we recognized that the notice to be given in connection with any proposed comprehensive revision of the zoning classifications for large areas of a community need not be as specific as the notice relating to a possible change in the zoning classification of one particular parcel of land. However, we did hold that notice of a public hearing on the possible enactment of extensive changes in a municipal ordinance must be such as to (1) "* * * reasonably inform the ordinary landowners in a community of the nature of the change proposed and the zoning classifications that would be affected thereby," (2) "* * * be sufficient to enable the landowners in a community to ascertain therefrom whether or not the proposed change would affect zoning classifications which attach to their land," and (3) " 'be readily intelligible to the intended reader, the average citizen at large.' " *Federal Bldg. & Dev. Corp.* v. *Town of Jamestown, supra* at 485-86, 312 A.2d at 590-91.

The essence of our holding was that a municipality desirous of providing sufficient notice of the requisite pub-

---

[2]The map is part of the 1974 ordinance.

lic hearing on a legislative proposal which updates, modifies, and changes its zoning ordinance must couch the notice in language which reasonably informs the average lay person of the nature of the proposed changes to the zoning regulations which presently control the use of his or her real estate.

The petitioners, in seeking to show a violation of the *Jamestown* rule, point to the map that appeared as part of the notice that was published in the newspaper. They would have us believe that this document is a cartographical disaster which did nothing in the way of telling the average real estate owners how the zoning proposal would affect their real estate. As proof of this assertion, they point to the following notation which appeared on the publicized version of the map:

> "Note: This map was prepared for newspaper reproduction only, and because of its limited size may be difficult to interpret correctly in zone boundary areas. The official map, drawn on assessor's plat maps, is on file at the town clerk's office."

Notwithstanding the newspaper notation and the vigorous arguments presented by petitioners, we think, after reviewing the six-full-page[3] advertisement, that the notice of hearing was reasonable and adequate and well within the spirit of the *Jamestown* rule.

To a cartographer, the town of Narragansett might appear like the profile of the head and neck portion of a giraffe standing in an erect position. Narragansett curves in a southwesterly direction along Rhode Island's coastline. Its width is like a somewhat distorted hourglass, a narrow top tapering to a narrower neck and bulging to a wide base at its southernmost extremity. Applying the

---

[3]Each page measures about 15" x 23". This is the standard size of pages found in most newspapers. The map occupies approximately three quarters of the last page of the advertisement.

map scale, the town measures approximately 13 miles in length with widths varying from 1½ miles at its top, to a mile at its midpoint, and nearly 3 miles along the town's southern boundary. From viewing the map much of the town's land appears to be undeveloped with the bulk of existing housing and public streets found in or near three summer resort areas situated along the Narragansett coastline — Bonnet Shores to the north, Narragansett Pier in the middle, and the Point Judith-Galilee area to the south.

Considering the size of Narragansett, the limited amount of public streets, and large percentage of undeveloped area, the published map would easily enable a nonlawyer landowner using reasonable diligence to determine how the proposal would affect the future use of his or her real estate. The ordinance creates nine zoning districts. The boundaries of each district as they appear on the map are depicted with bold black lines, and the zoning classification of each district is set forth within the area encompassed by the lines or alongside the boundary line. While the names of the individual streets are not enumerated, the streets are clearly marked by easily discernible black lines. We cannot fault the map, since it reasonably apprises the property owner of where the various zoning districts are located within the town. The ordinance tells the reader what can or cannot be done within those zones. If any question is unsatisfied, he or she by attending the public hearing and/or stopping at the town hall can attempt to satisfy his or her curiosity by discussing the matter with the town clerk or one of her staff assistants.

Anyone, in February 1974, unsure of the exact boundaries of the zoning district could have gone, as the notation on the publicized map suggested, to the town hall and there viewed the official zoning map. Once they saw the map and read sec. 2.4 of the proposed ordinance, all their doubts would have been resolved. This section sets out in plain,

everyday language the rules to be used in delineating the boundary lines of a district. According to sec. 2.4, boundaries that appear to be following the midline of a marker such as a road, street, or body of water shall be construed as going to the center of such a bound, and if the line appears to be following a platted lot line, the boundary line shall be the lot line. Should the boundary line divide a single ownership lot into two different districts, the owner can seek the board's permission and extend the use permitted in one district into the other portion of the lot for a distance of not more than 50 feet.

We see no need to dwell any longer on this facet of petitioners' contentions. The notice given by the publication of the ordinance and map was well within the *Jamestown* rule.

The Narragansett Town Council's proposal was an attempt to keep its zoning ordinance abreast with the tremendous growth and development that had taken place in the locality. Since we believe that this task will be increasingly confronted by other local legislatures in the near future, we have paused to reconsider the applicability of the *Jamestown* rule. After considerable reflection, it is our belief that the rule in the *Jamestown* case is over broad because it requires more information to be included within the notice of a comprehensive rezoning project than is necessary. We now are of the opinion that this rule can make the legislative process unduly burdensome and expensive.[4] A rule can be fashioned which calls for a notice that will serve the needs of a municipal government and amply protect the rights of the landowners but not necessitate an eight-column spread in a newspaper.

[4]One of the citizens who spoke at both the February 27 and March 6 hearings placed the advertising cost for the February hearing at just over $5,500.

If a municipality embarks upon a comprehensive updating of its zoning legislation, the requirements of due process can be satisfied by the publication of a notice of a hearing which (1) "indicates that a comprehensive revision is to take place," (2) "advises [interested] persons where and when a map of the proposed rezoning and accompanying text may be examined," and (3) indicates that the "proposals shown thereon may be changed as a result of further study or [because] of the views expressed at the public hearing." *See* 1 Rathkopf, *The Law of Zoning and Planning,* §10.05 at 10-24 (4th ed. 1975).[5] We will now proceed to consider the next facet of this controversy.

### The Fairness of the Hearings

In response to our writ, Narragansett has furnished us with transcripts of the events which transpired when the town council assembled on the evenings of February 27 and March 6, 1974 at the "cafetorium" of the town's junior high school to listen to the proponents' and opponents' views on the pending legislative proposal. The petitioners assert that a perusal of the transcripts will lead us to the conclusion that the hearings were a sham because comments made by the various members of the council clearly indicate that they were determined to adopt the proposal

---

[5]If substantial changes are made to the pending proposal, the council must publish a second notice and conduct a second hearing in order that compliance may be had with our mandate in *DeLucia* v. *Town of Jamestown,* 107 R. I. 179, 187, 265 A.2d 636, 639 (1970).

Following our approval of this opinion but prior to its publication, the General Assembly during the final days of its January 1976 session amended the notice requirements in the general enabling legislation, G. L. 1956 (1970 Reenactment) §§45-24-4 and 45-24-4.1, so that, apparently, the initial newspaper notice must contain a "statement of the proposed amendments to the ordinance * * * in its entirety" and that subsequent notices shall refer to the full description found in the original notice. Public Laws 1976, ch. 114. The amendment has no relevancy to the present controversy, but it may cast a shadow on this trilogy of minimum notice requirements. We leave such a question, however, to another day.

"as is" regardless of what issues might have been raised by the opponents. We have read the transcripts and, although the remarks to which petitioners allude are interesting, they fail to show that the issue of the adoption or nonadoption of the ordinance had been resolved long before the first citizen had her say.

Public Laws 1928, ch. 1277 provides that the council will conduct a public hearing at which an "* * * opportunity shall be given all persons interested to be heard upon the matter of the proposed ordinance." Obviously, one of the purposes of the public hearing is to learn what the views of the community are so that desirable changes can be brought to the attention of the legislative body before the proposal becomes law. *DeLucia* v. *Town of Jamestown,* 107 R. I. 179, 187, 265 A.2d 636, 639 (1970). Property owners, as a result of the published notice, are given the opportunity to express their views with respect to the classifications proposed for their and their neighbor's property.

The law, of course, affords many kinds and types of hearings. There are hearings that are judicial, or quasi-judicial, or legislative in nature. The Narragansett Town Council, as it sat and listened to the various views being expressed before it on each of the evenings in question, was participating in a legislative rather than a judicial hearing. Unlike a judicial hearing where issues of fact must be resolved without respect to the personal views of the judge, a legislative hearing may reach a decision based, in part at least, on the preconceptions or personal predilections of the legislators. *Smith* v. *Skagit County,* 75 Wash. 2d 715, 740-41, 453 P.2d 832, 847 (1969). If one reflects for a moment, one quickly realizes that the legislators' success at the polls is often based on their previously announced views or attitudes on issues of public interest. However, notwithstanding such preconceived views, a leg-

islator is still required to adhere to the basic requisites of fairness in matters where a statute mandates a public hearing and not only invites the public to attend but gives it an opportunity to be heard, because "[t]he right to be heard implies a reasonable hope of being needed." *Id* at 741, 453 P.2d at 847.

The court in the *Skagit County* case fashioned a test for determining whether a public hearing was conducted in a fair manner. The crucial question to be answered is "* * * whether a fair-minded person in attendance at all of the meetings on a given issue, could, at the conclusion thereof, in good conscience say that everyone had been heard who, in all fairness, should have been heard and that the legislative body required by law to hold the hearings gave reasonable faith and credit to all matters presented, according to the weight and force they were in reason entitled to receive." *Id.* In applying this test, the court pointed out that while the legislative body, in finally deciding the matter before it, may "draw upon all kinds and sources of information," a hearing must not only be conducted in such a manner as to be free of bias and prejudice, but it must also have "the appearance of being so." *Id.*

In applying the foregoing principles to the 1974 hearings, we note that the council president, in calling the February meeting to order, acknowledged that there were "some inequities" in the pending proposal, but, having in mind the interest of the "community as a whole," he and his associates thought that the pending ordinance was "workable" and "should be considered as it is." Following the president's initial remarks, one of the councilmen reminded all present that the proposal had been under consideration for almost 5 years, and he referred to the "* * * inordinate amount of effort and money" that had been expended over the years to implement the zoning plan. While this councilman remarked that "in retrospect" the

zoning problem might have been approached "in a better manner," he thought that the proposed ordinance was "infinitely better than the zoning that is on the books," even though the proposal "may" have some shortcomings. He concluded by promising that "if and when the ordinance is passed," he would immediately work for the establishment of a committee whose job would be to formulate a series of amendments that would cure any inequities, omissions, or weaknesses that it contains.

Later this councilman clarified his earlier remarks when, in answer to a direct inquiry as to how long the council knew of the existence of the inequities in the pending legislation, he replied: "I said that they may exist. * * * The point I am trying to make is, I am not prepared, nor can I identify any inequities in this. * * * I regret very much saying that there might be a possibility of changes. The world is changing and this is why we have Section 16 and if I knew the inequities, you can be assured that it would have [sic] considered before we advertised this. * * * We wouldn't have spent this kind of money if we had known of any."

As the meeting progressed, the president responded to several inquiries that were directed to the council. At one point he alluded to the "magnitude" of the ordinance and at another point he stated that he and his colleagues felt that there "might" be some inequities or omissions. During the give and take that went on, Narragansett's senior town solicitor continued to advise them to consider all suggestions offered and make the necessary amendments if the legislators thought the suggestions had merit. He cautioned the council that if the amendments were "too big," the proposal would have to be readvertised and a new hearing held on the amended version.

It is clear that the sole purpose of the remarks offered by the different members of the council was to make it

clear to those present that the legislators were not making any claim that they were blessed with the gift of infallibility. The president emphasized this point by telling the audience: "We know that everything drawn up has something wrong with it. Even the Magna Carta had things wrong with it."

Our examination of the transcript indicates that comments from the audience, both positive and negative, were received without any display of animosity on the part of the council. The record shows that everyone who sought to address the council was heard in a most courteous manner. Some of those who complained about the effect of the proposed rezoning on their property were reminded that their endeavors could be protected by the nonconforming use provisions of the new ordinance, or they were referred to certain other provisions where relief could be sought from the complaint they described.

All governmental agencies, be they on the executive, legislative, or judicial level, should strive for perfection, but none can guarantee its attainment. The thrust of the council membership's remarks was that the work product being discussed, although it may not be perfect, was the best their collective effort could produce. The citizens of Narragansett could ask for nothing more, and this court cannot fault the council's conduct as it tried to make its position known to those landowners who thought that the zoning proposal still needed some improvement.

## The Confiscation

To put this issue in its proper perspective, we should take a before-and-after view of the status of Golden Gate's and Butterfield's properties. Golden Gate owns a 238-acre parcel of land known as "Canonchet Farm." The property is located opposite "The Pier" and the "Town Beach" areas of Narragansett. Most of the property was zoned

for residential use with each single-family dwelling lot to have a minimum of 15,000 square feet and a two-family dwelling lot required 30,000 square feet. A small portion of the parcel was zoned for commercial purposes. Under the new ordinance all of Canonchet Farm is located in an "R-40 Rural Residence District." Each single-family dwelling lot in such a district must contain a minimum area of 40,000 square feet. Today a two-family structure placed in an R-40 district must be situated on a lot having at least 80,000 square feet.

In 1971 Butterfield purchased waterfront property known as "Lido's Beach." It is a rectangularly shaped undeveloped parcel measuring approximately 10½ acres. It has a frontage of nearly 900 feet on the shore and measures about 600 feet in depth between the ocean and a public highway parallel to the lot. The land was zoned for business, a classification which permitted a variety of uses, including commercial greenhouses or nurseries, churches, hospitals, hotels, motels, and government buildings. Lido's Beach now finds itself in a "B-C Waterfront Business District," a designation which eliminates the bulk of the previously accepted uses and restricts the property to such uses as a greenhouse not used for private commercial gain, the sale of handcrafted or home crafted products made on the premises provided that the merchandise is not displayed outside the structure, a public park or playground, a bathing beach, an outdoor swimming pool, a place of worship, a fire or police station, commercial recreation purposes, plus several uses permitted by way of special exception. The specially permitted uses include a motel, hotel, electric power substation, public utility tower, and marina.

The petitioners' claims of confiscation remind us of the well-established rule which holds that an existing zoning classification of property in and of itself confers no vested

right in the continuance of such classification because all property is subject to a municipality's exercise of its police power. *See, Norbeck Village Joint Venture* v. *Montgomery County Council,* 254 Md. 59, 66, 254 A.2d 700, 705 (1969); *Thomas* v. *Town of Bedford,* 11 N.Y.2d 428, 434, 184 N.E.2d 285, 287, 230 N.Y.S.2d 684, 687-88 (1962); *Gosselin* v. *City of Nashua,* 114 N. H. 447, 450, 321 A.2d 593, 596 (1974); *Gray* v. *Trustees of Monclova Township,* 38 Ohio St. 2d 310, 315, 313 N.E.2d 366, 369 (1974); *Edelbeck* v. *Theresa,* 57 Wis.2d 172, 180, 203 N.W.2d 694, 698 (1972). A zoning ordinance is not to be considered as confiscatory merely because the property may not be put to its most profitable use. 1 Rathkopf, *The Law of Zoning and Planning,* §6.04 at 6-9 (4th ed. 1975).

The special enabling legislation which gives Narragansett the authority to enact zoning legislation follows the general rule in that it specifically provides that nothing in the Act or any ordinance adopted pursuant to its provisions shall create any vested rights in any person, firm, or corporation. Public Laws 1928, ch, 1277, §7. The general enabling legislation by which most municipalities in this state enact zoning legislation contains a similar provision. General Laws 1956 (1970 Reenactment) §45-24-11; *see Nardi* v. *City of Providence,* 89 R. I. 437, 446, 153 A.2d 136, 141 (1959).

The confiscation issue which petitioners have raised cannot be resolved in these certiorari proceedings. The petitioners may pursue this question by seeking the assistance of equity. However, such an observation may be of no immediate assistance to petitioners if the rule requiring a litigant to exhaust his administrative remedies before he seeks equitable relief is applicable to these proceedings. This principle of exhaustion of remedies was adhered to in the *Nardi* case. Later, in *Frank Ansuini, Inc.* v. *City of Cranston,* 107 R. I. 63, 73, 264 A.2d 910, 915-16

(1970), we pointed out that there is no need to seek administrative relief where the basis of the suit is the contention that the ordinance is invalid on its face. There is a reasonable basis for this distinction.

A litigant's contention that the ordinance is unconstitutional in its application to his specific property could result in a needless judicial declaration if an application to the zoning board seeking a variance or exception met with success. However, there is no reasonable basis for forestalling a judicial inquiry when the challenge is made that the ordinance is unconstitutional not as it is applied to any particular property but in its general pattern and effect. Resort to administrative relief in those circumstances would only delay a judicial determination of those issues which of necessity must be resolved in court rather than at the administrative level.

With these principles in mind, we have examined both petitions, and it is clear that in each the contention that is being made is that the 1974 zoning ordinance is unconstitutional only as it is applied to each respective parcel of real estate. This being so, the petitioners are bound to exhaust their administrative remedy, and, if unsuccessful there, they may then seek judicial assistance.

In each case the petition for certiorari is denied and dismissed, the writ previously issued is quashed, and the record is remanded to the respondent town council with our decision endorsed thereon.

Mr. Justice Doris did not participate.

*Arcaro, Belilove & Kolodney, Samuel J. Kolodney* for Golden Gate Corporation; *Joseph G. Miller,* for Charles Butterfield, Jr., *et al,* for petitioners.

*James O. Watts,* Town Solicitor, *Frank L. Hinckley, Jr.,* Asst. Town Solicitor, *Mark S. Spangler,* for respondents.