[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This matter was tried before this Court, sitting without a jury, on the plaintiffs' claims for damages. The plaintiff, L.A. Ray Realty, according to the testimony presented at trial, is a general partnership made up of Robert C. Ray and four of his unnamed brothers. The plaintiffs, Richard Savage and G. Robert Savage (hereinafter collectively "Savage"), are the successors in interest to Savage Bros., Inc., one of the original plaintiffs in this case. The defendants are the Town of Cumberland, as well as its town council and planning board. The plaintiffs claim damages because of the manner in which the Town and its agencies denied their applications to subdivide parcels of their land in the Town.
I.
THE FACTUAL SETTING
This lawsuit began on January 26, 1989, when these plaintiffs and three others filed a seven count complaint against these defendants alleging that a zoning ordinance which purported to affect their property was null and void because it had been unlawfully adopted. In the seventh count the plaintiffs sought damages for the temporary unconstitutional taking of their property or alternatively for an assessment of damages for the inverse condemnation of their property. On January 23, 1990 motions for summary judgment by each side were heard by this Court. The plaintiffs' motions were denied. The defendants' motion was treated as a motion to dismiss and was granted. On appeal to the Supreme Court the judgment of dismissal was reversed. The case was remanded to this Court with directions to enter summary judgment in favor of the plaintiffs. L.A. RayRealty v. Town Council of the Town of Cumberland, 603 A.2d 311
(R.I. 1992). On August 14, 1992 final judgment was entered on the first four counts of the plaintiffs' complaint, which alleged that an amendment to the Town's zoning ordinance adopted by voter initiative and referendum approval violated the enabling act. The Supreme Court did not find it necessary to reach the constitutional issues raised in this aspect of the case because it was able to declare the purported amendment null and void as a violation of the State act.
On March 8, 1994 with leave of Court the plaintiffs filed a second amended complaint in four counts. They alleged that they were owners of real property in the Town of Cumberland, which had been zoned Agricultural A. On November 8, 1988 the voters of the Town approved by referendum an ordinance which required a minimum lot size of two acres for any lot in Agricultural A and B zoning districts.
The plaintiffs further alleged that the proposed amendment submitted by referendum to the voters of the Town either contained or should have contained an exception for lots of record and subdivisions filed with the Planning Board as of September 28, 1987. A considerable amount of evidence was received on the question of what precisely was submitted to the voters for approval and how what they approved was construed by Town officials. The complaint also alleges that on November 21, 1988 the Planning Board of the Town denied every pending application for subdivision of land in such zones which did not comply with the ordinance. The plaintiffs contend that because they filed their subdivisions with the Planning Board before September 28, 1987 the amendment did not apply to their applications and they had a right to develop their parcels without regard to the amendment.
On January 18, 1989 the Town Council adopted an ordinance confirming the provisions of the referendum ordinance. The plaintiffs were unable to develop their land according to the complaint until the Supreme Court invalidated the referendum and ordinance on February 12, 1992.
The plaintiffs contend that the actions of the Town which denied them an opportunity to develop their land by subdividing it into parcels of less than two acres violated the Due Process clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article One, Section Two of the Constitution of Rhode Island, as well as the Takings clause of the Fifth Amendment to the United States Constitution and Article One, Section Sixteen of the Constitution of Rhode Island. They claim damages under 42 U.S.C. §§ 1983 and 1988 for the deprivation of rights protected by the United States Constitution. They also claimed damages through inverse condemnation of their land between November 8, 1988 and February 12, 1992, but this claim was withdrawn at trial. Finally, they seek damages for the common law tort of interference with prospective economic advantage.
Based on the stipulated facts and the evidence presented at the trial what happened is not seriously disputed. The parties, however, do vigorously dispute the questions of why and how events happened as they did, as well as the factual and legal consequences of those events.
Savage submitted a subdivision application to the Town planning board to subdivide lots 2 and 3 on assessor's plat 29, "West Valley," before September 29, 1987. L.A. Ray Realty also submitted an application to subdivide lots 4 and 48 on assessor's plat 29, "Long Brook," before September 29, 1987. Both of these applications pertained to land in Agricultural A districts. The planning board had adopted subdivision regulations effective on September 29, 1987, which specifically stated that, ". . . those applications that have been submitted for subdivisions as of the date of passage of these Regulations will be permitted to continue under the Regulations in effect prior to adoption of these Regulations." This type of savings clause is referred to by the parties as a "grandfather" clause. On October 7, 1987 the Town zoning ordinance was amended to adopt the minimum lot size requirements of the subdivision regulations of September 29, 1987. Section 2 of the October 7, 1987 ordinance provided: "All lots of record and all subdivisions filed with the planning board as of September 28, 1987 shall be excepted." The parties have agreed that the planning board was considering these applications of L.A. Ray Realty and Savage under the pre-September 29, 1987 regulations and that both plaintiffs were relying on those regulations in the course of their proceedings before the board. According to those regulations:
 "Lots not served by a public water supply shall be a minimum of two (2) acres in area. Lots served by a public water supply, but not served by a public sewer system, shall be a minimum of 25,000 square feet. Lots served by a public water supply and a public sewer system shall be a minimum of 12,000 square feet."
The September 29, 1987 regulations and the October 7, 1987 conforming ordinance prescribe a scale of minimum lots sizes from 80,000 square feet down to 20,000 square feet depending on distances from public water supply, location relative to the Town watershed, and the service of public water and sewer system.
On April 20, 1988, Marlene Smith, a member of the town council, presented an ordinance to the council in amendment to the zoning ordinance which would have required a minimum residential lot size of two acres in Agricultural A and B districts, saving only lots already of record. After public hearings on June 1 and 15, 1988 the council did not pass the proposed ordinance. The mayor of the town, Francis Statkiewicz, appeared before the council at both hearings and testified in favor of the proposed amendment. The plaintiffs also appeared at both hearings and presented expert testimony in opposition to the proposal.
While the proposed amendment was pending, on May 15, 1988, L.A. Ray Realty submitted a subdivision application to the planning board to subdivide lot 9 on assessor's plat 29.
On July 7, 1988, Council member Smith tried again to change the minimum residential lot size to two acres in Agricultural A and B districts. This proposed amendment would have excepted subdivisions filed with the planning board as of September 28, 1987. At the required public hearing on August 3, 1988, Mayor Stetkiewicz and Mr. Harvey Salvas, the town building and zoning officer, as well as several other townspeople, testified in favor of the amendment. Once again, the plaintiffs presented testimony in opposition through counsel. The proposal was defeated for a second time.
In the meantime the plaintiffs' respective applications were making their way through the approval phases of the planning board procedures. By September 19, 1988 the Savage subdivision, "West Valley" was at the final plat stage. The board voted to continue that stage pending compliance by the applicant with seven requirements. The plaintiff contends that these requirements do not appear in the pre-September 29, 1987 regulations, but that Savage agreed to comply anyway. L.A. Ray Realty had segmented its "Long Brook" subdivision application into four sections at the request of the planning board.
Soon after the rejection of the proposed amendment by the Town Council, Ms. Karen Saucier, an elector of the town, began to circulate a petition to put a referendum on the ballot at the next general election for council candidates to be held in the town. The petition was drafted with assistance from the town solicitor, Thomas F. Almeida, pursuant to a request from the board of canvassers on August 11, 1988. The petition requested that in accordance with the town's home rule charter the following referendum be placed on the ballot for approval or rejection at the election to be held on November 8, 1988:
 "All land zoned Agricultural A or B in the Town of Cumberland shall require a minimum lot size of 2 acres except for pre-recorded lots. This Act shall take effect immediately upon regular validation of the vote if a majority of electors voting on this referendum item in the Town of Cumberland shall approve."
Both Mayor Stetkiewicz and his close political ally, Council-member Smith, favored and publicly campaigned for approval of the referendum. The town solicitor and eight of the fifteen members of the planning board are appointed by the mayor. Mr. Salvas, the zoning and building officer, was a supporter of the mayor, as well.
On September 8, 1988 Mr. Almeida requested that the Secretary of State put the following question on the ballot:
 "Shall the minimum lot size for all land zoned Agricultural A or Agricultural B within the Town of Cumberland be two (2) acres?"
In his September 8, 1988 letter to the Secretary of State Mr. Almeida concluded with the following language:
 "The question, if approved, would be inserted in the Zoning Ordinance as paragraph #7 in Article Three and said Article Three would be amended thereby to read as per the attached text." (Emphasis supplied).
Attached to the letter was a copy of Article Three, Area andYard Space, Section 1 and Section 2. Section 1 is shown to contain new language providing for a minimum lot size of two acres in Agricultural A and B districts. Section 2, however, continues to recite the language excepting subdivisions filed with the planning board as of September 28, 1987. A number of other technical improprieties attended the submission of this referendum to the Town's electors, all of which, of course, were mooted by the invalidation of the result by the Supreme Court. The plaintiffs, nevertheless, because of the solicitor's letter strongly urge that, even as unlawfully adopted, the referendum amendment should not have applied in any event to their pre-September 29, 1987 applications.
On November 8, 1988 the referendum was approved by a large majority of the town electors who voted on the question.
The next ensuing events took place because of two latent ambiguities in the referendum question. First, although the petition specified that the "act" would take effect immediately upon "validation" of the vote for approval by a majority of electors voting on the referendum, the referendum question itself specified no particular effective date. Second, the question did not deal with the problem of existing undersized lots of record, or, what was more important to the plaintiffs, pending subdivision applications.
Some time after the election Mr. Salvas met with the mayor and the town solicitor. At that meeting either the mayor or the solicitor advised Mr. Salvas that there were no "grandfather" rights under the referendum. In addition, on November 15, 1988 the solicitor sent a memorandum to the mayor giving his opinion that the referendum took effect upon certification of the election results. On November 18, 1988, Mr. Salvas, as building official, published a memorandum to all department heads and members of the zoning board and planning board to which he attached a "new" Article 3 Section 1 of the zoning ordinance. The "new" Article contained the added paragraph 7 in section 1, but did not retain section 2. A note to paragraph 7 indicated that it was effective on November 16, 1988 after certification of the results of the voter referendum. Mr. Salvas somehow regarded that note as a savings clause. Mr. Almeida also testified that he believed that some grandfather rights survived the referendum.
What happened next clearly belies any such belief.
The plaintiffs' subdivisions and a number of others involving lots of less than two acres in Agricultural A and B districts were pending at various stages before the planning board when the referendum passed. The first meeting of the board after the vote was scheduled for November 21, 1988. The chairman of the board, Mr. Kenneth Pascale, needed advice from the solicitor as to the effective date of the referendum and whether there was any provision which would preserve non-conforming subdivisions pending before the board. On November 21, 1988 Mr. Pascale met with the mayor and the solicitor in the conference room in the mayor's office. At that meeting the solicitor advised Mr. Pascale that there were no "grandfather" rights on which the planning board could grant relief to pending subdivision applications.
At the meeting L.A. Ray Realty's subdivision of Long Brook Section 2, was pending the final plat stage. Long Brook Sections 1, 3 4 were not on the board's agenda. Savage's West Valley subdivision had been at the final plat stage since September 19, 1988. The board had decided without any explanation not to hold a meeting in October 1988. Nor is there any explanation why West Valley was not on the November 21, 1988 agenda. The board voted unanimously to deny all pending applications which were subject to the two-acre agricultural district A and B referendum.
Although L.A. Ray Realty did have notice that Long Brook Section 2 was on the agenda for final plat consideration on November 21, 1988, it had no notice nor reason to believe that the board was to take any action with regard to Sections 1, 3 and 4. Savage had no notice whatever that the board proposed to take any action with respect to West Valley. The minutes of the meeting demonstrate that the plaintiffs had no meaningful opportunity to be heard before their applications were summarily denied.
The town council adopted an amendment to the town zoning ordinance on January 18, 1989 embodying the 2-acre minimum residential lot size in agricultural A and B districts effective on November 16, 1988, the date on which the voter approval was certified by the board of canvassers. This lawsuit ensued. The sole issue remaining for decision at this juncture is whether or not the defendants, or any of them, are liable to the plaintiffs, or either of them for damages. The question of the amount of damages, if any, to which either of the plaintiffs may be entitled, has been reserved for further briefing and decision, if appropriate.
The plaintiffs urge both a constitutional claim, in two aspects, and a common law tort claim. They say that they are entitled to damages under 42 U.S.C. § 1983 because their rights to substantive and procedural due process were denied when the town purported to amend its zoning ordinance by referendum and then through its officials denied their subdivision applications on November 21, 1988. They also claim that the town, by the same conduct tortiously interfered with their prospective contractual opportunities.
II.
THE DUE PROCESS CLAIMS
A. The plaintiffs' property interests:
The defendants argue that both plaintiffs have failed to meet a threshold requirement to the bringing of a Section 1983 action. According to their position, neither plaintiff had any "property" of which it was deprived by anyone with or without due process of law, either procedurally or substantively.
The Long Brook subdivision application submitted by L.A. Ray Realty applies to two adjacent parcels, lots 4 and 9, respectively, on assessor's plat 29. The defendants do not question L.A. Ray Realty's title to lot 4 on November 21, 1988, but they point out that lot 9 was the subject of a purchase and sale agreement, in which L.A. Ray Realty's obligation to take title to the land was subject to approval by the town planning board to subdivide the land into a minimum of 25 single-family house lots. It is clear, nonetheless, that the condition was for the mutual benefit of the parties, particularly the purchaser, L.A. Ray Realty, but it would not excuse any wrongful denial of a legitimate application by the planning board. In fact, the parties extended the agreement, after the board's initial refusal, during the pendency of this litigation and while certain Court-ordered "detrimental reliance" hearings were ongoing. The defendants' contention that L.A. Ray Realty lacked a sufficient property interest in the land it held under the purchase and sale agreement because a consummation of the agreement was conditioned on conduct by the defendants, themselves, is utterly without merit. See Annicelli v. South Kingstown, 463 R.I. 133, (R.I. 1983).
A more serious issue is raised by the defendants' claim that the plaintiffs had no more than a "hopeful, unilateral expectation that their subdivision plans . . . would be approved." Such an expectation, they argue, is not a "property" interest protected by the Due Process Clause of the Fourteenth Amendment. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577-78, 33 L.Ed.2d 548, 561, 92 S.Ct. 2701, 2709 (1972). They point to the fact that neither plaintiff's application had been finally approved by the board, nor had even been publicly heard, as required by law before it could have been approved. They cite two U.S. District Court decisions in which the lack of final administrative approval deprived the applicants of an entitlement to a property interest under the Amendment. MichiganEnvironmental Resources Associates, Inc. v. County of Macomb,669 F. Supp. 158, 161 (E.D. Mich. 1987) and Molgaard v. Town ofSaledonia, 527 F. Supp. 1073, 1080 (E.D. Wis. 1981).
In response, the plaintiffs contend that their respective applications had met all the pertinent requirements of the zoning and subdivision regulations in effect at the time of their filing and as of the time of their summary denial on November 21, 1988 pursuant to the construction of the referendum adopted by the town's officials. They acknowledge that no final approvals had been voted by the board. Nevertheless, they say, they were entitled to approval as a matter of law under the decision inJeffrey v. Platting Board of Review of the Town of SouthKingstown, 103 R.I. 578, 239 A.2d 731 (1968). In that case the Court ruled that a planning board had no discretion to disapprove a plat that conformed to its rules. Id., at 587.
In order to resolve this issue some further evidence must be analyzed to see if the facts, as fairly proved, support the plaintiffs' conclusion of law. Until November 21, 1988 the rules of the planning board, as codified by the zoning ordinance with respect to minimum residential lot sizes, was the October 7, 1987 amendment to the zoning ordinance, which excepted from its provisions applications filed before September 29, 1987. According to the record (Plaintiff's Exhibit 7) Savage filed its initial application on July 15, 1987. At that time the pertinent regulation (Plaintiffs' Exhibit 8) read as follows:
 "The minimum size: Lots not served by a public water supply shall be a minimum of two (2) acres in area. Lots served by a public water supply, but not served by a public sewer system, shall be a minimum of 25,000 square feet. Lots served by a public water supply and a public sewer system shall be a minimum of 12,000 square feet."
It is clear that the planning board understood that the Savage application was being processed and considered under the "old Subdivision Regulations." (Plaintiff's Exhibit 14, Minutes of April 20, 1988 meeting). On September 19, 1988 the Savage subdivision was on the board's agenda at the "final plat" stage. At this stage the subdivider is required to file four copies of the subdivision plat showing certain required information with prescribed supporting material. At that time Savage was required by the board to meet eight conditions before his final plat would move to the "final action" stage, at which there would be a public meeting followed within forty-five days by the board's final decision. Although Savage contends that these eight "additional" requirements did not derive from the pre-September 29, 1987 regulations, a careful reading of Exhibit 8, especially change #4 to Section II, "Modification of Standards," does not necessarily support that conclusion. In any event, the defendants presented no evidence that, but for the referendum amendment, the Savage plat was not ready on November 21, 1988 to be submitted to a public hearing and ultimate final approval by the board. There is no question whatever that the Savage plan always met the lot size requirements of the "old" regulations at all times. The evidence is clear that Savage's application was still at the "final plat" stage as of November 21, 1988 only because it had not been considered at a regular board meeting in October 1988. The chair of the board, Mr. Frank Pascale, testified without contradiction that as of November 21, 1988 the Savage application had satisfied all subdivision regulations other than the two acre minimum size requirement. As to the L.A. Ray Realty application he was not sure.
The L.A. Ray Realty applications for the Long Brook subdivision have a somewhat more complex history. L.A. Ray Realty's initial application to subdivide lot 4 on plat 29 was filed on September 11, 1987. The applicant plainly relied on the old subdivision regulations because he sought to create 25,000 square foot residential lots off Diamond Hill Road. According to Steven Clarke, of Commonwealth Engineers Consultants, Inc., who testified as a site development and subdivision planning expert for the plaintiffs, part of this subdivision eventually became Section 1 of the Long Brook subdivision. He testified without contradiction that preliminary plat approval for Section 1 was granted in July 1988. A final plat had not been submitted because a question regarding the placement of an oil-water separator, required by the State Department of Environmental Management (DEM), had not been resolved. Since this was a pre-September 29, 1987 filing, DEM approval was not required under the pertinent subdivision regulations.
In May 1988, at the request of the board, L.A. Ray Realty submitted two filings. One for Section 2 (Plaintiffs' Exhibit 58) and another for Sections 3 and 4 (Not in evidence). In these filings so far as they pertain to Lot 9 on assessors plat 29, Dorothy Billington and June Clamp joined L.A. Ray Realty as applicant subdividers. The preliminary plat for Section 2 was approved some time in 1988, because the final plat was on the board's agenda for approval on November 21, 1988. Originally, Section 2 of the Long Brook subdivision was proposed as a permitted division of land because all of the proposed lots had frontage on a public street. Nevertheless, the mayor, acting as public works director of the town, refused to permit a water connection for these lots, and so, the section had to be re-configured as a subdivision. Approval was thereby delayed until after the November 8, 1988 referendum.
Mr. Clarke testified without contradiction that both Sections 1 and 2 of the Long Brook subdivision complied with all pertinent subdivision regulations as of November 21, 1988. Although Sections 3 and 4 of the subdivision were still at the pre-application stage, it was his opinion as an engineer and subdivision planner that it was possible to lay out lots in those sections in compliance with subdivision regulations in effect before the referendum amendment.
The plaintiffs rely on several decisions of United States Courts of Appeal to support their due process claims.
In Southern Cooperative Development Fund v. Driggers,696 F.2d 1347 (11th Cir. 1983) the plaintiff brought suit against a county and its commissioners under 42 U.S.C. § 1983 for refusing to approve a preliminary subdivision plat, despite the fact that the plat complied with subdivision regulations in force at the time of application and initial consideration by the county's commissioner. The Court held:
 "What we are called upon to decide is whether the Commission's actions were authorized as a matter of Florida law, and if so whether their actions were in violation of the Due Process Clause of the Fourteenth Amendment." Id., at 1351. (Emphasis supplied).
The Court concluded:
 "We agree with the district court that Broward County v. Narco Realty, 359 So.2d 509 (Fla. App. 1978) enunciated the principle of Florida law that is controlling here. In that case even though Narco had complied with all of the legal requirements for platting its land, the Commission contended that it still had the discretion to approve or to refuse approval of any plat. The court rejected this argument saying:
 All persons similarly situated should be able to obtain plat approval upon meeting uniform standards. Otherwise the official approval of a plat application would depend upon the whim or caprice of the public body involved.
 . . . the property owner has done all the law required of him to entitle his plat to be recorded. At that point any discretion in the County Commission vanished." Id.
In Scott v. Greenville County, 716 F.2d 1409 (4th Cir. 1983), a real estate developer had brought suit against the county, the county council and certain intervening landowners for violation of 42 U.S.C. § 1983 by wrongfully denying his applications for building permits and holding up their issuance for over sixteen months more while an appeal was pending. The plaintiff had successfully appealed the council's initial denial of his permits and had obtained a trial court ruling declaring the council's action illegal and ordering immediate issuance of the permit. On the issue of whether or not the plaintiff had a constitutionally protectible property interest in getting the permit the Court held:
 "Under South Carolina law settled well before he applied for the building permit, Scott enjoyed an entitlement to the issuance of a permit upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance. Niggel v. City of Columbia, 254 S.C. 19, 173 S.E.2d 136, 137-38 (1970); Pure Oil Division v. City of Columbia, 254 S.C. 28, 173 S.E.2d 140, 142 (1970). This entitlement extended to Scott even though he held only an option to purchase the property or similar interest, rather than actual legal title. See, e.g., Abbeville Arms v. City of Abbeville, 273 S.C. 491, 257 S.E.2d 716 (1979).
 There is no refutation, particularly in light of the subsequent state court proceedings, of the fact that Scott's plans for a multi-family housing project fully complied with the requirements of the zoning ordinance in effect as of the date on which he formally applied. Moreover, under South Carolina law, even the publicly announced intention of the County Council to reconsider the zoning of the area in which Scott proposed to build could not undermine his entitlement to a permit, as `vested rights acquired under a zoning ordinance in effect at the time of the application will be protected against a change in the zoning ordinance.' Pure Oil, supra, 173 S.E.2d at 142. Scott therefore held a cognizable property interest, rooted in state law, to which federal due process protection extended." Id., at 1418-19. (Emphasis supplied.) (Footnotes omitted.)
In Cunningham v. City of Overland, State of Missouri,804 F.2d 1066 (8th Cir. 1986), the plaintiffs sued the city board of alderman under 42 U.S.C. § 1983 for denying their respective applications for merchant's licenses to do business at premises they were under contract to buy. The state courts had ruled that the merchant's license had been wrongfully withheld. The Court pointed out:
 "It is established in this case that the zoning regulations of the City of Overland permitted Cunningham and Seiler Enterprises to operate an auto repair and auto body shop at the Brown Road property. See Cunningham, 691 S.W.2d [464 (Mo. Ct. App. 1985)], at 464 (holding the Board's denial of the use for an auto repair shop in an industrial district in this matter was `unreasonable and oppressive'). Id., at 1068-69.
In Bateson v. Geisse, 857 F.2d 1300 (9th Cir. 1988) the plaintiff sued the City of Billings, Montana and its council members under 42 U.S.C. § 1983 for a substantive due process violation in refusing to grant a building permit and a procedural violation in refusing to approve a minor preliminary plat application to divide this land. The Court rejected his claim of a procedural violation, but sustained his claim of a substantive deprivation of his property in violation of the Due Process Clause. The Court held:
 "As of June 26, 1984, Bateson had met all of the requirements necessary for the City to issue him a building permit. The City of Billings' regulations provide that once an applicant's building plans comply with the code and other applicable laws and the fees are paid, the building official must issue a building permit to the applicant. Uniform Administrative Code § 303(a) (adopted by Billings) (emphasis added). These regulations do not provide for review by the City Council before a building permit can issue. The City Council voted to withhold Bateson's building permit without providing Bateson with any process, let alone `due' process. This sort of arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, amounts to a violation of that individual's substantive due process rights." Id., at 1303
In Bello v. Walker, 840 F.2d 1124 (3rd Cir. 1988) the plaintiff applied to a municipality for review and approval of a subdivision plan in five phases. The plan was approved and building permits were issued for the first phase. The application for building permits for Phase V was denied by the municipality's code enforcement officer, purportedly because Phases II through IV had not been completed. The plaintiffs successfully obtained State court rulings which ordered the municipality to issue the permits. They proceeded in the meantime with an action for damages under 42 U.S.C. § 1983 on the ground that the denial deprived them of property without procedural and substantive due process. The Court ruled that when a state provides reasonable remedies to rectify a legal error by a local administrative body it satisfies the required procedural due process strictures of the Fourteenth Amendment. In overruling the district court's summary judgment for the defendants on the substantive due process claim the Court held:
 "We need not define, at this juncture, the outer limits of the showing necessary to demonstrate that a governmental action was arbitrary, irrational, or tainted by improper motive. The plaintiffs in this case presented evidence from which a fact finder could reasonably conclude that certain council members, acting in their capacity as officers of the municipality improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits. These actions can have no relationship to any legitimate governmental objective, and if proven, are sufficient to establish a substantive due process violation actionable under section 1983." Id., at 1129-30.
In Scott, Cunningham and Bello, supra, the plaintiff's right under state law to a building permit was established in litigation in the courts of the respective states involved. In Southern Cooperative Development Fund, supra, the Court cited a state court decision which established the applicant's entitlement under state law to the approval of its subdivision plat. In Bateson, the Court found that the administrative code under which the municipality operated mandated the issuance of the permit. In addition the city attorney advised the council that, "there [would be a] substantial probability that the Court would overturn that action." 857 F.2d, at 1302.
The origin of this search for "property" interests lies in the sparse eloquence of Mr. Justice Stewart's Opinion in Boardof Regents v. Roth, supra:
 "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S., at 577, 92 S.Ct., at 2709, 33 L.Ed.2d, at 561.
Based on the record made at trial, the Court concludes that the plaintiff Savage has proved that it had complied with all the subdivision regulations in effect at the time of the original filing of its application with the planning board when its subdivision was summarily denied on November 21, 1988. It had acquired a "property interest in its right to subdivide its property in accordance with those regulations. Since the only grounds of denial was the application of the invalid referendum amendment, the Courts of this state would have reversed that denial, just as the state courts had in Scott, Cunningham andBello, supra, and as state courts would have in SouthernCooperative Development Fund and Bateson, supra. The language cited from Jeffrey v. Platting Board of Review of the Town ofSouth Kingstown, supra, demands no less.
The various subdivisions of L.A. Ray Realty, however, call for a differential analysis. Long Brook Section 1 was in substantially the same status as Savage's West Valley subdivision. The requirement of an oil-water separater had nothing to do with subdivision regulations, as they were in effect, when this plat was originally filed. L.A. Ray Realty was entitled, as a matter of law, to the final approval of this subdivision based on the record presented at trial. The only grounds for its denial was the invalid amendment. L.A. Ray Realty had a property interest in the approval of its subdivision.
Like Section 1 of Long Brook, Section 2 was ready for approval of its final plat from which it could proceed to public hearing and final approval, if the referendum ordinance had not intervened. The only grounds for denying this subdivision at the November 21, 1988 meeting of the Board was that the residential lots did not comply with the two-acre minimum size requirement imposed by the invalid referendum. L.A. Ray Realty was entitled as a matter of state law to final approval of this plat. That entitlement was a constitutionally protected property interest.
The record is not altogether clear as to what stage Long Brook Sections 3 and 4 had reached when their subdivisions were denied on November 21, 1988. Based on the testimony of Mr. Clarke, it seems that a pre-application sketch plan had been filed with the board. Whether they had been approved or not is not clear. They were plainly not at all ready for even a preliminary plat to be submitted. Accordingly, unlike with respect to Sections 1 and 2, L.A. Ray Realty had no property interest amounting to an entitlement of approval of its plat of Sections 3 and 4, since they could have been disapproved for a myriad of unforeseeable reasons. L.A. Ray Realty, nonetheless, was entitled as a matter of law to have its application with respect to these subdivisions fairly considered in accordance with procedural due process standards.
B. Substantive due process:
The plaintiffs do not argue that the subject matter of the referendum amendment deprived them of their property without due process of law. Inferentially, they would have to concede that a properly adopted minimum lot size limitation of two acres in agricultural districts would not violate their due process rights. No argument is made that the two-acre limitation serves no valid governmental objective of the town.
The plaintiffs do, nonetheless, point to several factors which would tend to show that the invalid amendment was the product not of a bona fide purpose to serve the general welfare of the town, but was rather the product of personal, politically-inspired animus on the part of the mayor directed at the principals of the two plaintiff entities. The referendum, they argue, was inspired by the failure of the mayor, and his political allies on the town council, to obtain passage of a legitimate amendment in compliance with the enabling statute. They point to the favorable testimony of the mayor at the hearings before the council, political association between the mayor and the council member proposing the amendment, the assistance from the town solicitor in the petition process and submission of the question to the secretary of state for inclusion on the ballot, and the mayor's active campaign on behalf of approval of the referendum. The mayor readily conceded in his testimony that he strongly favored a two-acre minimum residential lot size in agricultural districts. He testified, however, that he honestly believed that such a limitation served the best interests of the town as a whole. Having in mind that a substantial portion of the land area (approximately 90% according to the undisputed testimony of the mayor) of the town was zoned agricultural, and that the amendment, if adopted, would affect many more landowners than these plaintiffs, much more would need to be shown to prove that politically-inspired animus directed at these particular plaintiffs motivated the mayor to support the referendum, or inspired the electorate to approve it.
Considerable time was spent at the trial receiving evidence with regard to the conduct of the town solicitor in framing the ballot question and in construing the amendment once it was approved by the electors of the town. The town solicitor was a mayoral appointee and a political ally of the mayor. The referendum question, as it appeared on the petition, contained a savings clause only for "pre-recorded lots." On September 8, 1988, the town solicitor requested that the secretary of state put an abbreviated form of the referendum on the ballot. Omitted from the ballot question as submitted to the secretary of state was any reference to the savings clause and the effective date of the proposal. Also, in his correspondence to the secretary of state the town solicitor wrote: "The question, if approved, would be inserted in the Zoning Ordinance as paragraph #7 in Article Three, and said Article Three would be amended thereby to read as per the attached text." To his letter the solicitor appended a version of Article Three which included two sections. Section 1 contained the added paragraph 7 limiting minimum lot sizes in Agricultural A and B Districts to two (2) acres. Section 2 contained the 1987 "grandfather" clause excepting lots of record and subdivisions filed with the planning board as of September 28, 1987. The inconsistency between the submission and ballot question, on the one hand, and the referendum petition is obvious.
The plaintiffs contend that this inconsistency became meaningful as to them only after the question was approved. The board of canvassers certified the approval of the referendum on November 16, 1988, but in the meantime the question of the effective date of the amendment and whether there was any savings or "grandfather" provision was still open. On November 15, 1988 the solicitor published an opinion in memorandum form that the minimum lot size became effective upon certification of the election results. Sometime prior to his publishing a memorandum of his own, the building official met with the mayor and the solicitor and was advised that Section 2 of Article Three had been eliminated. He thereupon issued a memorandum with a revised version of Article Three, without any Section 2, for insertion by town department heads and zoning and planning board members in their copies of the zoning ordinance. It is clear from his testimony that he relied on the advice of the solicitor in deleting Section 2 from the revised ordinance, and was never shown the version of Article Three appended to the solicitor's letter to the secretary of state. At trial the building official had the notion that a notation of the effective date of paragraph 7 was a form of "grandfather" or savings clause.
In addition to the solicitor's advice to the building official, the plaintiffs point to the conference among the mayor, the town solicitor and the chair of the planning board on the afternoon before the November 21, 1988 meeting of the planning board as further evidence of the mayor's improper motivation to use governmental power to deprive them of their property rights. Even if the mayor cherished a strong ill-will against these plaintiffs, there were approximately a dozen or so other developers whose subdivisions were doomed by the mayor's decision, whatever role the solicitor played. At the meeting of November 21, 1988, L.A. Ray Realty was one of four developers whose subdivisions were on the agenda that night and immediately affected by the construction of the amendment by town authorities to invalidate all pending subdivisions which did not conform.
Although not clearly articulated as such, it appears that properly analyzed, the plaintiffs' substantive due process arguments in this respect do not depend on the invalidity of the referendum amendment. If they are correct, even if the amendment had been legitimately adopted, they were deprived of their property not to serve some legitimate governmental purpose of the town but to satisfy the mayor's political animosity. This observation gives rise to two major difficulties which must be overcome by the plaintiffs. First, the evidence must show that the sole reason for the denial was the mayor's opposition. Second, the evidence must show that the construction of the amendment was so unreasonable as to be arbitrary, capricious or irrational. Otherwise, this case is no more than an appeal from a planning board decision and not a civil rights claim. SeeChiplin Enterprises v. City of Lebanon, 712 F.2d 1524 (1st Cir. 1983); Creative Environments, Inc. v. Estabrook, 680 F.2d 822
(1st Cir. 1981), cert. den. 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982).
However much satisfaction the mayor might arguably have enjoyed at the plaintiffs' plight and no matter how much he might personally and politically have arguably relished the prospect of these plaintiffs being among those whose developments may have been cut off, that joy and relish does not exclude a genuine desire on the part of the mayor, and the town, as indicated by the referendum results, to limit development of the town's agricultural districts, irrespective of who thereby got hurt. The plaintiffs understandably do not contend that all of the town electors who voted for approval of the referendum bore them any personal or political animosity. Furthermore, even if the summary dismissal of all pending non-conforming subdivisions by the board at its November 21, 1988 meeting was instigated by the mayor, as the plaintiffs contend, the board's action, however it may have been procedurally improper, can nonetheless be justified as a reasonable construction of the referendum amendment. The precise question, as approved by the electorate, contained no reference to an effective date, and, more important, it did not specify its application, either to existing or proposed subdivisions. Even without any intervention by town officials, board members could reasonably have concluded, even if erroneously, that pending applications were not excepted from the lot size limitation.
The plaintiffs do not argue, and the evidence would not support any argument, that the mayor and the solicitor realized at the time that the amendment was invalid, or that it actually excepted pending applications, and advised the board otherwise. Such deliberately deceitful conduct would, of course, if proved, present another case. The more likely conclusion from the evidence is that the town, and its officials, honestly believed that the amendment was valid and enforceable and that there were no exceptions. As a result this case is clearly distinguishable from Bello v. Walker, supra, because in that case there were no reasons for denial related to the merits of the application. The case of Elmsmere Park Club Limited Partnership v. Town ofElmsmere, 771 F. Supp. 646 (D. Del. 1991), is also of no help to the plaintiffs for the same reason. In that case the Court relied on Bello, Southern Cooperative Development Fund andBateson, and found an issue of a substantive due process violation raised where a town arbitrarily refused to issue a building permit to a landowner until it could change its zoning laws to exclude occupancy of certain apartments. In that case there was no legal authority whatever for the town to delay issuance of the permit. In our case, the amendment was at least reasonably arguable authority to deny all non-conforming pending applications. To the same effect is Southern Co-operative,
where there was no rational basis for delaying the landowner's application until the law could be changed. In our case, there is no reliable direct evidence that the board delayed any application that should have been granted until the zoning ordinance could be changed. Although some of the board's delays while the referendum was pending between August and November of 1988 are suspicious, the Court declines to draw any inference that these delays were motivated by any expectation that the amendment would cut off pending subdivisions. In each case there was a reasonable ground for delay, acceded to at the time by the plaintiffs. In Scott the intervention by the county council in what would otherwise have been the routine issuance of a permit was held to be the basis for a substantive due process violation. In our case, although extreme, the board's reaction to the referendum amendment is not so unreasonable as to be arbitrary or capricious, whether or not the mayor intervened improperly. InBateson, the city council was held to have arbitrarily administered its zoning regulations in violation of substantive due process rights when it singled out one individual to be treated discriminatorily. In our case, these plaintiffs were obviously not singled out for discriminatory treatment. All non-conforming pending applications were struck down on November 21, 1988.
The plaintiffs spent a considerable period of trial time in their effort to prove that the mayor had developed a keen dislike for them by the time of these events in 1988. Describing his feelings as personal and political animus does not do them justice. The Court will not attempt to decide whether or not the mayor engaged in all the petty and spiteful conduct attributed to him by the plaintiffs. The question for decision here is not whether the mayor despised the plaintiffs but whether or not that animadversion caused the board to deny the plaintiffs' applications irrationally and capriciously without so much as color of lawful authority. As to that, this Court concludes that the referendum, as construed, not only by the solicitor, but initially by another justice of this Court, provided a reasonable basis, even if erroneous for some other reason, for the board's action.
C: Procedural due process:-
(1) The November 8, 1988 referendum: —
In considering the plaintiffs' procedural due process claims the Court shifts the focus of analysis from what the town did to how it went about doing what it did. In some respects the analysis is easier; in some more difficult. The plaintiffs claim first, that the enactment of the referendum by ballot of the electors, denied them the due process constitutional right of notice and an opportunity to be heard protected by G.L. 1956(Reenactment of 1988) §§ 45-23-4 and 45-24-4. The violation by the town of those statutory provisions is stare decisis in this case. L.A. Ray Realty v. Town Council, 603 A.2d 311, 315 (R.I. 1992). The plaintiffs claim, also, that the summary denial of their applications on November 21, 1988, all but one of which was not scheduled to be heard denied them any meaningful opportunity to be heard on the issue of whether there were any exceptions, or "grandfather" provisions which might have saved their applications.
Our Supreme Court was careful to avoid issuing any ruling as to the constitutionality of a referendum amendment to a local zoning ordinance. Its caution was caused by the opinion of the United States Supreme Court in Eastlake v. Forest CityEnterprises, Inc., 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976). As our Supreme Court pointed out, in that case the United States Supreme Court held that the referendum process in itself was not violative of the due process clause of the Fourteenth Amendment. In City of Eastlake, supra, the zoning amendment by referendum was challenged on the ground that it constituted a standardless delegation of a legislative function which would permit the state's police power to be exercised in an arbitrary and capricious manner. The referendum was not challenged as violative of the landowners' right to procedural due process. One of the dissenting justices would have invalidated the referendum on that basis. 426 U.S. 668, 680, 49 L.Ed.2d 132, 141, 96 S.Ct. 2358, 2365 (Mr. Justice Powell, dissenting).
The plaintiffs correctly point out that adequate notice to and opportunity to be heard by affected landowners has long been held by our courts to be a jurisdictional requirement, in the nature of a due process requirement, for the amendment of a zoning ordinance. Federal Building and Development Corp. of theState of Rhode Island v. Town of Jamestown, 112 R.I. 478, 484,312 A.2d 586, (1973). Although the "Jamestown rule" was modified for comprehensive re-zoning in Golden Gate Corporation v. Townof Narragansett, 116 R.I. 552, 560, 359 A.2d 321, 325 (1976), adequate notice and a fair opportunity to be heard were still regarded as due process requirements. It should be noted that at the time of these decisions the Rhode Island Constitution contained no express due process clause as such. Neither of these cases hold that only the statutory forms of notice and hearing will satisfy the requirements of the due process clause of the Fourteenth Amendment.
Since the proposed amendment affected some 90% of the land area of the town, was of general application and did not single out these particular plaintiffs, from a Federal constitutional point of view it was a local legislative or administrative act and not a judicial or quasi-judicial one. Under the circumstances for the same reasons that a referendum is not a violation of due process as a standardless delegation it is not an arbitrary or capricious denial of an affected landowner's right to be heard. That is not to say that in this State, under the law established by our Supreme Court, such a referendum will satisfy due process requirements of notice and an opportunity to a fair hearing. We must keep in mind that the plaintiffs here are claiming relief under 42 U.S.C. § 1983, a Federal statute. Relief ought to be granted only if due process rights were violated as a matter of Federal law.
A careful reading of City of Eastlake and the cases distinguished in that Court's opinion discloses that a general local referendum, as opposed to a neighborhood veto or other limited popular control of zoning changes, will satisfy Fourteenth Amendment due process. For that reason, the Court rejects the plaintiffs' argument that the violation of the notice and hearing section of the pertinent statutes necessarily requires a finding of a deprivation of procedural due process. These sections are not necessarily a codification of due process for Federal law purposes under § 1983, as the plaintiffs insist. This Court subscribes to the reasoning of Judge Torres inSmithfield Concerned Citizens v. Town of Smithfield, 719 F. Supp. 75, 83 (D.R.I. 1989), aff'd 907 F.2d 239 (1st Cir. 1990):
 "Certainly, states are free to require more than what is mandated by the fourteenth amendment. However, state statutes that do require more cannot expand the reach of procedural due process any more than state statutes that require less can shrink it. Otherwise, the parameters of procedural due process would vary from state to state and violations of state law would be magically transformed into federal constitutional questions. While state law must be resorted to in determining whether one has been deprived of a property right, it plays no role in assessing whether the procedure employed passes constitutional muster.
 Here, there can be no question but that the Smithfield Ordinance, like any other zoning ordinance, was a legislative act. Consequently, procedural due process did not require that the plaintiffs receive notice or an opportunity to be heard. Bi-Metallic, supra; Rogin v. Bensalem Township, 616 F.2d 680, 692-94 (3d Cir. 1980), cert. denied, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). By the same token, the defendants' alleged failure to comply with the Rhode Island open meetings statute does not constitute a violation of due process. Creative Environments, 680 F.2d at 830; Roy v. City of Augusta, Maine, 712 F.2d 1517, 1522-23 (1st Cir. 1983). In these respects, the instant case is no different from a series of others in which similar attempts to convert alleged violations of state land use laws into federal constitutional claims by simply labeling them as such have been rejected. E.g., Chiplin Enterprises, Inc. v. City of Lebanon, 712 F.2d 1524, 1527 (1st Cir. 1983); Creative Environments, 680 F.2d at 833. Briefly stated, the plaintiffs' allegations may set forth a state law claim but they do not articulate a violation of procedural due process."
(2). The November 21, 1988 meeting:
The subdivision regulations prescribe a four step procedure for the consideration of subdivision plans. At each step the planning board considers the subdivision and takes such action at a regular meeting as may be appropriate at each step. At step 1, the pre-application sketch plan, the board may approve in principle, approve subject to modification or disapprove with reasons. At step 2, the preliminary plat, the board may approve, approve subject to modification or disapprove with reasons. At step 3, the final plat may be accepted by the board, or, implicitly, not accepted. Notice of the review of the final plat is given in writing to all abutters. At step 4, the public hearing, at which abutters and other parties in interest may be heard, the board shall approve, modify and approve, conditionally approve or disapprove the plat. Written notice of the public hearing is given to the subdivider and abutters. Notice to others is published in a newspaper of local circulation. Apparently, within the time frame established by the regulations the subdivider puts the plan or plat on the board's agenda for review, discussion, approval and acceptance at each of the first three steps. The Board itself schedules the final step.
Except for L.A. Ray Realty's final plat of Long Brook Section 2, all of the required scheduling, review, discussion, modification, hearings, approvals, modifications was short-circuited on November 21, 1988. All pending non-conforming subdivisions were summarily denied. As we now know, the Board's action violated state law because the zoning amendment had not been validly adopted. It is not clear from the record whether these plaintiffs pursued their right or appeal to the subdivision board of review, although it has been suggested that such an appeal would have been patently futile.
While the adopting of a zoning amendment of general application to ninety percent of the land area of the town might be considered legislative in the sense that procedural due process might be satisfied through some other means than direct or actual notice and an opportunity to be heard at a scheduled meeting of the agency with the power of decision, the application of that amendment to particular landowner's application for subdivision approval is equally clearly quasi-judicial. Weighing the individual interests at stake in the fair consideration of their applications against the governmental interest in a summary disposition without any notice or opportunity to be heard plainly comes out in favor of the individual interest. See Mathews v.Eldridge, 424 U.S. 319, 335, 47 L.Ed.2d 18, 96 S.Ct. 893 (1976). The Constitution is usually held to require some kind of hearing before the State deprives a person of property. Zinermon v.Burch, 494 U.S. 113, 127, 108 L.Ed.2d 100, 110 S.Ct. 975 (1990). In some circumstances, however, it has been held that a statutory provision for a post deprivation hearing, or a common law tort remedy for erroneous deprivation, satisfies due process. Id.,
494 U.S., at 128.
In considering the adequacy of the process actually provided by the State in this case, the notions of finality and post deprivation remedies become intertwined. As has been pointed out, the decision of the board on November 21, 1988 was anything but final. Section 45-23-14 requires that the town establish a planning board of review with the same powers as a zoning board of review. The town charter in Section 1602 D. established the zoning board of review as the planning board of review. Under the statute, charter and subdivision regulations that board of review has the power to hear and decide appeals in which error is alleged in any order, requirement, decision or determination of the planning board. The board of review is required to fix a reasonable time for public hearing with notice and is required to decide the appeal within forty-five (45) days of the hearing. Judicial review of the decisions of the board of review is established by § 45-23-20. While L.A. Ray Realty had actual notice of the planning board's action on November 21, 1988 at the time, it is inferable that Savage, as well, learned of the board's action in time to claim a timely appeal.
In any event, the town council codified the referendum amendment as an amendment to the town zoning ordinance on January 18, 1989. Since the town council did not comply with the notice and hearing provisions of § 45-24-4(b), the ordinance was declared invalid in L.A. Ray Realty v. Town Council, supra,
along with the referendum amendment. At about the same time this action was commenced, the original plaintiffs in this action each commenced actions in this Court seeking writs of mandamus directing the planning board to hold hearings on their applications. On June 13, 1989 this Court granted each plaintiffs' motion for summary judgment in part and ordered the planning board to hold hearings to determine whether or not each plaintiff had detrimentally relied on the subdivision regulation and zoning ordinances in effect prior to the November 8, 1988 referendum. Under that order, if the board found as a matter of fact that the plaintiffs had so relied to their detriment the board was required to hear their applications under the ordinance and regulations in effect at the time of the original application.
3. The "detrimental reliance" hearings:
As a consequence of this Order, "detrimental reliance" hearings were held by the board during 1989, commencing on July 17, 1989 and concluding on August 21, 1989, when the board found no detrimental reliance on the part of these plaintiffs on the basis of the facts presented and denied the applications for nonconformance with the applicable amended zoning ordinance and subdivision regulation. The plaintiffs urge that the conduct of the mayor and the town solicitor before and during these hearings provide further evidence of the mayor's rancor toward these plaintiffs. They point specifically to the advice of the solicitor at the August 21, 1989 meeting (Exhibit 75) not to follow the Order of this Court, but to decline to apply detrimental reliance doctrines in zoning cases to subdivision platting cases, and to continue to apply the zoning ordinance in effect on November 21, 1988 to these applications. They also urge with considerable merit that a memorandum from the mayor to the planning board dated July 10, 1989 (Exhibit 73), suggesting how they should conduct their hearing, was an inappropriate intervention and plainly tainted the board's impartiality in view of the mayor's well known attitude toward these applications as well as the applicants. While these plaintiffs got a hearing, its fairness is definitely questionable.
4. Appeal to the board of review:
L.A. Ray Realty claimed its administrative appeal to the board of review. The record is not clear as to whether or not Savage claimed an appeal. In any event, before L.A. Ray Realty's appeal could be heard, this Court on January 23, 1990 dismissed the pending applications for mandamus for failure to exhaust administrative remedies and dismissed this action as to all counts. While their appeal from this Court's judgment was pending, L.A. Ray Realty pursued its administrative appeal and Savage sold its land.
The course of L.A. Ray Realty's appeal before the board of review could not have been encouraging to Savage. The appeal was heard in part on September 12, 1990. The mayor appeared at the hearing and testified and examined witnesses. On October 10, 1990 the hearing was resumed. At this hearing, also, the mayor appeared, examined witnesses and presented argument to the board in opposition to the appeal. The board of review voted to deny the appeal by a three-to-two vote. The plaintiffs question the fairness of this hearing based on the intensive and extensive intervention by the mayor in the proceedings and the legal advice to the board of review provided by an assistant town solicitor appointed by the mayor. The record does not disclose whether the plaintiff sought judicial review under the statute of the board's decision.
Assuming for the sake of argument that the plaintiffs were entitled to due process hearings on November 21, 1988 on their entitlement to approval of their subdivision applications and that the summary denials without prior notice or hearing deprived them of any right to be heard, the question remains whether the post-deprivation procedures established by this state's law were adequate remedies. For guidance we need to turn back to Zinermonv. Burch, supra. In describing the rationale for so-called "Parratt rule," from Parratt v. Taylor, 451 U.S. 527, 68 L.Ed.2d 420, 101 S.Ct. 1908 (1981), that a deprivation of a constitutionally protected property interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 procedural due process claim, unless the State fails to provide an adequate post-deprivation remedy, the Court pointed out that the tort remedy was all the prisoner was due, because any pre-deprivation procedural safeguards that the State did provide, or could have provided, would not address the risk of the particular kind of deprivation the prisoner sustained.Zinermon, 494 U.S., at 129. This Court finds that the failure of the board to conduct hearings on the pending subdivisions not on its agenda on November 21, 1988 was plainly "random, unauthorized" conduct of "State actors," which could not have been foreseen and prevented by any kind of pre-deprivation procedure. The board was plainly aware of its duty to place subdivision applications on its agenda and its obligation not to take action without hearing from each applicant. Its action on November 21, 1988 appears to have been unprecedented and unanticipated. The readily available and promptly accorded, at least partially, mandamus remedy was a more than adequate post-deprivation remedy for the board's failure to accord plaintiffs a fair hearing before denying their applications. Furthermore, nothing prevented these plaintiffs from following the statutory administrative appeal and judicial review procedures available to them under the statute. See Bello v.Walker, supra, 840 F.2d at 1128, especially fn. 3; Cohen v.City of Philadelphia, 736 F.2d 81 (3rd Cir. 1984); CreativeEnvironments. Inc. v. Estabrook, 680 F.2d 822, 829-30 (1st Cir. 1982). This Court subscribes to the reasoning of the U.S. Court of Appeals, Third Circuit, in Cohen, supra:
 "We thus join the First and Seventh Circuits in holding that substantive mistakes by administrative bodies in applying local ordinances do not create a federal claim so long as correction is available by the state's judiciary. Any other holding would lead to the danger that: any plaintiff in state court who was asserting a right within the broadly defined categories of liberty or property and who lost his case because the judge made an error could attack the judgment indirectly by suing the judge under section 1983. That would be an intolerable interference with the orderly operations of the state courts. Due process is denied in such a case only if the state fails to provide adequate machinery for the correction of the inevitable errors that occur in legal proceedings. . . ." Ellis v. Hamilton, 669 F.2d 510, 514 (7th Cir.), cert. denied, sub nom. Ellis v. Judge of the Putnam Circuit Court, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). In this case, because Pennsylvania has provided a means of correcting the errors that will sometimes occur at the administrative level, no deprivation without due process of law has occurred." 736 F.2d, at 86.
Nothing in Vito v. Department of Environmental Management,589 A.2d 809 (R.I. 1991) compels a different result. First,42 U.S.C. § 1983 provides relief for violation of rights protected by the United States Constitution. By the time of the Vito
decision, our State Constitution had a parallel due process clause in Article I, Section 2. It is not clear whether the process held by our Supreme Court to be due is that due under our State Constitution or that due under our State's construction of rights protected by the Fourteenth Amendment. Second, the constitutional right affirmed in Vito was a due process right to have a timely hearing at the administrative level within ninety days. Third, the plaintiffs there sought and obtained prompt relief by the very same kind of action, mandamus, as was used here to remedy due process procedural violations. Fourth, as a consequence, our Supreme Court did not need to consider whether the post-deprivation remedy, judicial review and relief, mandamus or declaratory judgment, as in the case here, remedied the deprivation of a timely hearing as it found to be required by due process.
The Court concludes that the plaintiffs were not deprived of any right to substantive or procedural due process protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Accordingly their claims for damages under42 U.S.C. § 1983 in Counts I and II are denied and dismissed.
III.
THE COMMON LAW INTERFERENCE CLAIM
Once again the analytical focus must shift when the plaintiffs' common law tort claims in Count III are considered. Just as a governmental tort is not necessarily a deprivation of due process, the fact that governmental agents have not violated due process does not mean that they have not committed a tort. The conduct of the agents of the town must be analyzed in the light of the common law tort of interference with prospective economic advantage. The elements of this tort, as set out inMesolella v. City of Providence, 508 A.2d 666 (R.I. 1986), are: 1) the existence of a business relationship or expectancy; 2) knowledge by the interferor of the relationship or expectancy; 3) an intentional act of interference; 4) proof that the interference caused the harm sustained; and 5) damages to the plaintiff.
The defendants concede that the plaintiffs have proved the first two elements. The very point that damages may be awarded for interference with "expectancies" distinguishes this tort from a deprivation of "property" without due process of law. The evidence is overwhelming that the town, through its agents, including its chief executive and administrator, knew that these plaintiffs expected to develop the lots in the proposed subdivision for sale.
As to the third element it is notable that the Court inMesolella, while quoting Restatement (Second) Torts § 766B, failed to include the words "improper" or "wrongful" to qualify the intentional act of interference. According to that case, "Malice, in the sense of spite or ill will, is not required; rather legal malice — an intent to do harm without justification — will suffice. The burden is on the defendant toshow justification." (Emphasis supplied.) 508 A.2d, at 669-70.
Motive must be distinguished from intent. The mayor'smotive in supporting and promoting the unlawful referendum, and in being present at legal briefings of town officials, and in advising the planning board, and in appearing before the planning board of review may have been to control the development of the town's agricultural land in an orderly way, but his intent in so doing was to interfere with the prospective business advantage of land developers in the town, including the plaintiffs. The town solicitor's motive in assisting in the drafting of a voter initiative petition, and submitting a ballot question to the secretary of state, and advising the respective boards about the construction and application of the invalid amendment may have been to use his best efforts to assure a valid amendment to the zoning ordinance under the town's home rule charter, but the evidence is clear that his intent was to assist the mayor in foreclosing the plaintiffs' chances to succeed in their development plans. The electors of the town who voted on the referendum question on November 8, 1988 may well have beenmotivated by a desire to serve the best interests of the town generally, the consequences of their approval, however, was to block the plaintiffs' legitimate expectation of development of their property. The town, speaking through its electors,intended these natural and probable consequences of its actions. It was no secret that on November 8, 1988 there were pending subdivisions of land, like the plaintiffs', which would be eliminated by the referendum approval, if it were valid.
These plaintiffs are in an analogous position to that of the plaintiff in Mesolella. The defendant town adopted, applied and enforced an invalid ordinance with the intent to interfere with their expectancy of developing and marketing residential lots of less than two acres in agricultural districts. That amendment, as enforced by the building official, as interpreted by the town solicitor to the planning board and the board of review, and as applied to these plaintiffs, was considered by all of these town agencies as providing no "grandfather" clause for pending applications, even though there was good cause for doubt as to that conclusion. The town directly and wrongfully interfered with the plaintiffs' legitimate expectations by the adoption of the amendment through the referendum approval on November 8, 1988 and the codification of the amendment by its council on January 18, 1989. The town vicariously interfered wrongfully when its executive officials, especially its chief executive, pursued these plaintiffs to the exclusion of all others in the single-minded enforcement and application of the amendment to their proposed subdivisions.
The town has pleaded some form of immunity as an affirmative defense to the plaintiffs' claims. In neither its pre-trial nor its post-trial brief does it argue the application of the doctrine. Probably the town planning board and the town council and their respective members enjoy legislative immunity, and so, as to them, individually and collectively, this action ought to be dismissed. As to the town's own liability, both direct and vicarious, a different problem arises. See Mesolella, 508 A.2d at 672. The question of the application of legislative immunity to a municipality was left open. In addition,Mesolella did not reach the question of governmental immunity for the acts of non-legislative town officials.
It is not necessary to trace the zig-zag course of governmental immunity in Rhode Island from Kelley v. Cooke,21 R.I. 29, 41 A. 571 (1898) to the present, as was necessary inMesolella. Suffice it to say that the town solicitor and the mayor were not engaged in the kind of activity which was excluded from G.L. 1956 (1985 Reenactment) § 9-31-1 by Calhoun v. City ofProvidence, 120 R.I. 619, 629-30, 390 A.2d 350, 356 (1978);Mesolella, supra, 508 A.2d at 668. Nor does the exclusion of the "public duty" doctrine elucidated in Ryan v. StateDepartment of Transportation, 420 A.2d 841, 843 (R.I. 1980) apply here, since this Court has found that the government officials here had a specific intent to harm these plaintiffs. The conduct of these governmental officials fulfills the standard of egregious misconduct, which would bar the application of the public duty exception to the governmental tort claims act, even if it had been merely negligent.
The Court has thus far decided that the defendant Town of Cumberland has engaged in tortious conduct, for which it is liable in damages, if it has caused any, to the respective plaintiffs. At the conclusion of the trial on May 19, 1994, the Court invited briefing on the questions of liability only. The parties were implicitly if not explicitly promised an opportunity to brief causation and damage issues, if those issues were to be reached. Those issues are now before the Court for decision. The parties will file simultaneous briefs as to causation and damages before the close of the Court's business day on December 16, 1994. The parties may, if they wish, file response briefs before the close of the Court's business day on January 6, 1995.